The STATE of Ohio, Appellee,

v.

GRINSTEAD et al., Appellants.

[Cite as *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018.]

Court of Appeals of Ohio,
Twelfth District, Butler County.

Nos. CA2010–06–150, CA2010–07–163, CA2010–07–164, CA2010–07–165, CA2010–07–166, CA2010–07–167 and CA2010–07–180.

Decided June 20, 2011.

Michael DeWine, Attorney General, and Karla G. Perrin and Robert W. Cheugh II, Assistant Attorneys General, for appellee.

Sirkin, Kinsley & Nazzarine Co., L.P.A., Scott Ryan Nazzarine, H. Louis Sirkin, and Jennifer M. Kinsley, for appellants.

RINGLAND, Judge.

{¶ 1} Defendants-appellants, John Grinstead, Larry Lough, and Tri E Technologies, L.L.C., appeal from their convictions in the Butler County Court of Common Pleas. For the reasons outlined below, we affirm.

{¶ 2} On May 20, 2009, the Butler County Grand Jury returned an indictment against Tri E, a defunct company involved in a variety of industrial processes that leased office and warehouse space located at 100 Security Drive, Fairfield, Butler County, Ohio, and its former president, Grinstead, and former CEO, Lough, charging them with, among other things, failing to prepare a hazardous-waste manifest, illegal transportation of hazardous waste, illegal disposal of hazardous waste, illegal storage of hazardous waste, and criminal endangering. The

charges stemmed from appellants' alleged illegal transportation and disposal of over 100 tons of cathode-ray tube ("CRT") glass, a component used in television and computer monitors that contains lead, on property owned by Ray Skinner, generally referred to as the Skinner property, located in West Chester, Butler County, Ohio.

{¶ 3} On December 16, 2009, the Butler County Grand Jury returned an additional indictment against appellants, charging them with, among other things illegal disposal of hazardous waste, illegal storage of hazardous waste, and criminal endangering. These additional charges stemmed from appellants' alleged abandonment of over 9,000 pounds of hazardous materials in their Fairfield facility following their eviction from the property.

{¶ 4} That same day, the Butler County Grand Jury also returned an indictment against Lough, charging him with causing pollution of the waters of the state. This charge stemmed from an allegation claiming that Lough ordered Jimmy C. Bales III, a former employee of Tri E, to dump two large totes containing several hundred gallons of acidic materials left over from Tri E's experiments and industrial processes conducted at their Fairfield facility into a storm drain that ultimately flowed into a local pond.

{¶ 5} On May 14, 2010, following a four-day trial, a jury returned a verdict finding appellants guilty of failing to prepare a hazardous-waste manifest, illegal transportation of hazardous waste, illegal disposal of hazardous waste, illegal storage of hazardous waste, and criminal endangering. The jury also returned a verdict finding Lough guilty of causing pollution of the waters of the state. Appellants subsequently filed a motion for acquittal pursuant to Crim.R. 29(C), which the trial court denied. Appellants now appeal from their convictions, raising two assignments of error for review.

{¶ 6} Assignment of Error No. 1:

{¶ 7} "The trial court erred in upholding the convictions against Grinstead, Lough, and [Tri E] because they were not supported by sufficient evidence and were against the weight of the evidence."

{¶ 8} In their first assignment of error, appellants argue that the trial court erred by denying their Crim.R. 29(C) motion for acquittal because the state provided insufficient evidence to support their convictions. Appellants also argue that their convictions were against the manifest weight of the evidence.

{¶ 9} Crim.R. 29(C) permits a trial court, upon motion, to set aside a guilty verdict and enter a judgment of acquittal. *State v. Willis*, Butler App. No. CA2009–10–270, 2010-Ohio-4404, 2010 WL 3620209, ¶ 8. This court reviews a trial court's decision on a Crim.R. 29(C) motion for acquittal using the same standard as that used to review a sufficiency-of-the-evidence claim. *State v.*

*Jones,* Lucas App. No. L–08–1001, 2009-Ohio-6501, 2009 WL 4727761, ¶ 32; *State v. Wright,* Hamilton App. No. C–080437, 2009-Ohio-5474, 2009 WL 3323337, ¶ 26.

{¶ 10} Whether the evidence presented is legally sufficient to sustain a verdict is a question of law. *State v. Lazier,* Warren App. No. CA2009–02–015, 2009-Ohio-5928, 2009 WL 3721008, ¶ 9; *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. In reviewing the sufficiency of the evidence, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Diar,* 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 113, quoting *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. Proof beyond a reasonable doubt is "proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs." R.C. 2901.05(D).

{¶ 11} On the other hand, a challenge based on manifest weight of the evidence concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. *State v. Ghee,* Madison App. No. CA2008–08–017, 2009-Ohio-2630, 2009 WL 1581139, ¶ 9, citing *Thompkins* at 387. A court considering whether a conviction is against the manifest weight of the evidence must review the entire record, weighing the evidence and all reasonable inferences, and consider the credibility of the witnesses. *State v. Hancock,* 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 39; *State v. Lester,* Butler App. No. CA2003–09–244, 2004-Ohio-2909, 2004 WL 1239179, ¶ 33; *State v. James,* Brown App. No. CA2003–05–009, 2004-Ohio-1861, 2004 WL 766427, ¶ 9. These issues, however, "are primarily matters for the trier of fact to decide since the trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given the evidence." *State v. Walker,* Butler App. No. CA2006–04–085, 2007-Ohio-911, 2007 WL 646257, ¶ 26; *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. Therefore, the question upon review is whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Good,* Butler App. No. CA2007–03–082, 2008-Ohio-4502, 2008 WL 4117165, ¶ 25; *State v. Blanton,* Madison App. No. CA2005–04–016, 2006-Ohio-1785, 2006 WL 902362, ¶ 7.

{¶ 12} As this court has previously stated, although a review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct concepts, "a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of

sufficiency." *State v. Perkins,* Fayette App. No. CA2009–10–019, 2010-Ohio-2968, 2010 WL 2573770, ¶ 9; *State v. Urbin,* 148 Ohio App.3d 293, 2002-Ohio-3410, 772 N.E.2d 1239, ¶ 31. In turn, this court's determination that appellants' convictions were supported by the manifest weight of the evidence will be dispositive of the issue of sufficiency. *State v. Rigdon,* Warren App. No. CA2006–05–064, 2007-Ohio-2843, 2007 WL 1662245, ¶ 30, citing *Thompkins,* 78 Ohio St.3d at 386, 678 N.E.2d 541; see, e.g., *State v. Rodriguez,* Butler App. No. CA2008–07–162, 2009-Ohio-4460, 2009 WL 2762754, ¶ 62.

### May 20, 2009 Indictment

{¶ 13} In regard to their convictions stemming from the May 20, 2009 indictment, appellants initially argue that the collection methods employed to achieve a representative sample, as well as the lab testing procedures performed on those samples, were inadequate and improper. Therefore, according to appellants, because the collection and testing procedures performed were inadequate and improper, the test results indicating that the materials collected from the Skinner property constituted hazardous waste were insufficient and unreliable to sustain their convictions for failing to prepare a hazardous-waste manifest, illegal transportation of hazardous waste, illegal disposal of hazardous waste, and criminal endangering. We disagree.

{¶ 14} Pursuant to Ohio Adm.Code 3745–51–24, a waste, as that term is defined by Ohio Adm.Code 3745–51–02, is toxic, and therefore hazardous, "if, using the toxicity characteristic leaching procedure" generally referred to as the TCLP test, "the extract from a representative sample of the waste" contains, among other contaminants, lead, "at a concentration equal to or greater than the respective value" found in Table 1. According to Table 1, entitled "Maximum Concentrations of Contaminants for the Toxicity Characteristic," lead has a regulatory toxicity level of 5 mg/l.

{¶ 15} At trial, Jeff Smith, an 18–year veteran with the Ohio Environmental Protection Agency ("OEPA") currently employed as an environmental specialist with the Hazardous Waste Management Division, testified that he was dispatched to the Skinner property after being contacted by the division of emergency and remedial response to investigate potential hazardous waste. After arriving at the scene, Jeff testified that he located the materials in question, which, according to him, appeared to be "computer monitor glass or CRT glass," a type of glass known to have leachable lead, a toxic substance capable of causing neurological damage if ingested.

{¶ 16} In furtherance of his investigation, Jeff, who received annual training on sampling methods in accordance with OEPA rules and regulations, testified that he used "glass jars and a bowl and a scoop" to take two samples of the glass material that had fallen on the ground, as well as one sample from an open

container. When asked how he went about making sure that he obtained the necessary representative samples, Jeff testified that he followed the collection procedures he was trained to perform by "taking a bowl and scooping up an amount in there and mixing it up, and then filling the size container that the lab requires." Jeff then testified that each of the three CRT glass samples he collected failed, thereby revealing their hazardous nature, after testing indicated that the samples contained 90 to 180 mg/l of lead, well above the regulatory toxicity level of 5 mg/l.

{¶ 17} In addition, Timothy Smith, a hazardous-materials spill responder with Westin Solutions, Inc., a corporation contracted by the United States Environmental Protection Agency to conduct a variety of hazardous-waste operations, testified that upon arriving at the Skinner property, he observed numerous "cubic yard boxes of crushed glass material, a broken glass material," some of which had "sloughed out of the boxes onto the ground." Timothy then testified that he took two soil samples where the glass material had fallen on the ground, as well as samples of like-sized CRT glass material "from each one of the boxes." Continuing, Timothy testified that he then "took a random grab" of the CRT glass material he previously collected from each of the boxes in order to establish two CRT glass samples for testing. When asked if he believed he collected a "representative sample on this particular case," Timothy testified affirmatively.

{¶ 18} Thereafter, Tiffany Black and Kelly Hagan, both lab technicians at ALS Laboratories, Inc., a corporation that conducts lab testing for both governmental agencies and private companies, testified that they performed a "total metals" analysis, as well as the TCLP test, on the two soil samples and two CRT glass samples obtained by Timothy. Black, who analyzes "a hundred plus samples a day," testified that one of the soil samples she analyzed contained 10 mg/l of lead, while the other contained 180 mg/l of lead. Hagan, on the other hand, who analyzes a "couple of hundred" samples a day, testified that one of the CRT glass samples she analyzed contained 400 mg/l of lead, while the other contained 240 mg/l of lead. Both women also testified that they followed the necessary testing procedures and protocols when conducting their respective tests.

{¶ 19} In appellants' defense, Timothy Schmelzer, a former employee of Techniglass, a company involved in the production of CRT glass, who was not familiar with the sampling techniques "in the service of an environmental investigator," testified that one would not receive a representative sample by merely "scoop[ing] a handful of glass up and test[ing] it", since CRT glass is made of five separate components each containing different levels of lead.[1] In

---

1. Schmelzer, however, also testified that CRT glass "always shattered * * * across the components," thereby making it "very likely" that the broken CRT glass collected at the Skinner property had "everything in them."

addition, Lough testified in appellants' defense that the sampling techniques used by "Mr. Smith," without differentiating between Jeff Smith or Timothy Smith, were not in line with the established EPA sampling guidelines.

{¶ 20} After a thorough review of the record, we cannot say the jury clearly lost its way by finding that the collection methods and testing procedures were proper so as to create a manifest miscarriage of justice requiring that appellants' convictions for failing to prepare a manifest, illegal transportation of hazardous waste, illegal disposal of hazardous waste, and criminal endangering be reversed. As noted above, the state presented extensive evidence regarding the collection and testing procedures used for all of the samples obtained from the Skinner property. The jury, which has the primary responsibility of weighing the evidence and assessing the credibility of witnesses, found this evidence, all of which was subject to numerous challenges throughout appellants' lengthy cross-examination, sufficient and reliable to prove that the samples collected were representative and properly analyzed. Therefore, because the state presented competent, credible evidence regarding the collection and testing procedures employed by the state indicating the hazardous nature of the material collected from the Skinner property, appellants' first argument is overruled.

{¶ 21} Next, appellants argue that their convictions for failing to prepare a hazardous-waste manifest, illegal transportation of hazardous waste, illegal disposal of hazardous waste, and criminal endangering must be reversed "because the weight of the evidence clearly demonstrated that [they] did not act recklessly in believing that the material was not hazardous." In support of their claim, appellants argue that they were not reckless in illegally transporting and disposing of the CRT glass at the Skinner property without preparing a hazardous-waste manifest, "since they subjectively, objectively, and reasonably believed that the CRT glass they disposed of contained less than 5 [mg/l] lead." We disagree.

{¶ 22} Pursuant to R.C. 2901.22(C), a "person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."

{¶ 23} At trial, Stephen Canfield, a 20–year veteran with the Ohio Attorney General's Office Environmental Enforcement Unit who investigates environmental-law violations, testified that as part of his investigation, he conducted interviews with Grinstead and Lough, both of whom admitted that the CRT glass had a lead content between 19 and 22 percent. Canfield also testified that during his interview with Lough, Lough referred to the CRT glass as "bad stuff" that "could

not be buried." In addition, Dennis Lloyd, a former employee of Tri E, testified that he discussed the "hazardous nature" of the CRT glass with Grinstead and Lough, as well as "what to do with the glass with radiation shielding and that type of thing." The state also introduced a United States patent dated May 17, 2005, for "Method and System for Extracting Metal from Glass Waste," which listed Lough as the inventor and Tri E as the assignee, that explicitly stated that CRT glass waste is particularly "troublesome for glass recyclers and waste disposal facilities" due to its "high levels of lead." The patent also stated that "CRT waste [was] the number two contributor to hazardous lead waste in the United States."

{¶ 24} In appellants' defense, Lough testified that after Tri E obtained the CRT glass, which he classified as "recycled processed glass that was made for Hewlett Packard," Tri E had it tested at the University of Cincinnati, the University of Melbourne, and "at several independent laboratories." According to Lough's testimony, the CRT glass "passed the test," indicating it contained less than 5 mg/l of lead.[2] Thereafter, Lough testified that because their testing indicated that the CRT glass was not hazardous, they did not believe that a hazardous-waste manifest was necessary prior to transporting and disposing the glass at the Skinner property.

{¶ 25} After a thorough review of the record, we cannot say that the jury clearly lost its way by finding that appellants acted recklessly so as to create such a manifest miscarriage of justice requiring that their convictions for failing to prepare a manifest, illegal transportation of hazardous waste, illegal disposal of hazardous waste, and criminal endangering be reversed. As noted above, although Lough claimed that Tri E's testing revealed that the CRT glass was not hazardous, the state's evidence indicates that appellants discussed the hazardous nature of CRT glass and knew that it had a lead content between 19 and 22 percent. In addition, the state's evidence indicates that Lough, who was listed as the inventor on a patent describing CRT glass as having "high levels of lead," referred to the CRT glass left on the Skinner property as "bad stuff" that "could not be buried." It is well established that "[w]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony." *State v. Bromagen,* Clermont App. No. CA2005–09–087, 2006-Ohio-4429, 2006 WL 2466807, ¶ 38. Therefore, because the state presented competent, credible evidence indicating that appellants acted, at a minimum, recklessly with regard to the hazardous nature of the CRT glass that they illegally transported and disposed of at the

2. Lough, however, did not present any supporting documentation to support this claim.

Skinner property without preparing a hazardous-waste manifest, appellants' second argument is overruled.

### December 16, 2009 Indictment

{¶ 26} As it relates to their convictions stemming from the December 16, 2009 indictment, appellants argue that their convictions for illegal disposal and illegal storage of hazardous waste must be reversed because "the evidence at trial clearly demonstrated that [they] did not recklessly abandon these materials" at their Fairfield facility. In support of their claim, appellants argue that because they "lost their lease, were evicted, and only had three days to move out before the warehouse was padlocked," that they were forced to leave the material behind. According to appellants, therefore, the materials simply cannot be classified as waste. This argument lacks merit.

{¶ 27} Appellants were charged with illegally disposing and storing hazardous waste in violation of R.C. 3734.02(F), which provides, "No person shall store, treat, or dispose of hazardous waste * * * except at * * * any of the [approved hazardous waste facilities]." "Waste," as defined by Ohio Adm.Code 3745–51–02, is "any discarded material" that is, among other things, "abandoned." Materials are "abandoned" by being disposed of, burned or incinerated, or "accumulated, stored, or treated (but not recycled) before or in lieu of being abandoned by being disposed of, burned, or incinerated." Ohio Adm.Code 3745–51–02(B); *State v. Schachner* (1999), 131 Ohio App.3d 808, 817–818, 723 N.E.2d 1127.

{¶ 28} At trial, Jimmy Bales, a former employee of Tri E, testified that after Tri E received notice that it was being evicted from their Fairfield facility, Grinstead and Lough asked him to assist them in transporting "stuff [they] needed to go back in business" at another location. Thereafter, when asked why certain items were left behind, which included over 9,000 pounds of various hazardous materials, Bales testified that Tri E did not have any use for the remaining materials and, therefore, "that's why we didn't bring them with us." In addition, Chris Longwell, the former president of Scott Street Partners, the owner of the Fairfield property leased to Tri E, testified that although Tri E was evicted from the property, leaving behind "everything from furniture all the way to chemicals," nobody from Tri E ever contacted him in an effort to retrieve any of the remaining materials left on the property.

{¶ 29} In appellants' defense, Brian Davis, a police officer and friend of Grinstead, testified that after informing Grinstead that he could not delay his eviction, he advised him to "collect up [his] most valuable assets and leave."[3] In

---

3. Davis, however, who admittedly was "not * * * an expert with evictions," also testified that "the court would be very understanding" if the evicted party called the property owner to ask if he could return to the property and retrieve any materials left behind.

addition, Lough testified that he discussed an extension with attorneys from Scott Street Partners by "telling them we needed an extension on time to remove everything from the building" but that "[t]hey did not allow it." Lough also testified, "Once we left the building, we were not permitted back in."

{¶ 30} After a thorough review of the record, we cannot say the jury clearly lost its way by finding that appellants abandoned the hazardous materials so as to create a manifest miscarriage of justice requiring their convictions for illegal disposal and illegal storage of hazardous waste to be reversed. See *Kuntz v. Dir. of Ohio, EPA* (Aug. 21, 1998), Montgomery App. No. 16429, 1998 WL 892107, at *7. As noted above, the state presented evidence indicating that appellants removed from their Fairfield facility only items that they deemed necessary and useful to establish their new business at a different location. The state also presented evidence indicating that appellants never attempted to contact the property owner after being evicted in order to retrieve any of their remaining materials. Therefore, because the state presented competent, credible evidence indicating that the material left on the property was abandoned and, as a result, was waste as defined by Ohio Adm.Code 3745–51–02, appellants' third argument is overruled.

{¶ 31} Finally, Lough argues that his conviction for causing pollution of the waters of the state must be reversed because the state provided insufficient evidence "to show that the materials which constituted the water pollution charge were hazardous waste." This argument lacks merit.

{¶ 32} Lough was charged with causing pollution of water of the state in violation of R.C. 6111.04, which provides, "No person shall cause pollution or place or cause to be placed any sewage, sludge, sludge materials, industrial waste, or other wastes in a location where they cause pollution of any waters of the state." In turn, contrary to Lough's claim, in order to convict him for causing pollution of the waters of the state, the state was not required to prove that the materials were "hazardous waste." Instead, based on a clear reading of the statute, the state was merely required to prove that the materials constituted "sewage, sludge, sludge materials, industrial waste, or other wastes" as those terms are defined by R.C. 6111.01.

{¶ 33} Regardless, after a thorough review of the record, we find that the state provided sufficient evidence to prove that the materials dumped into the storm sewer constituted industrial waste. "Industrial waste," as defined by R.C. 6111.01(C), means "any liquid * * * resulting from any process of industry, manufacture, trade, or business, or from the development, processing, or recovery of any natural resource, together with such sewage as is present."

{¶ 34} The state presented evidence indicating that Lough ordered Bales, who, at that time, was an employee at Tri E, to dump two large totes containing

several hundred gallons of acidic materials left over from experiments and industrial processes conducted at the Tri E facility into a storm drain that ultimately flowed into a local pond. The state also presented evidence that the acidic materials, which Bales testified constituted a mixture of "nitric acid and water," burned a hole through the one-inch steel forklift prongs used to transport the materials and etched the concrete surrounding the storm drain.[4] Therefore, although Lough claimed that he never ordered Bales to dump any materials into the storm drain, the state's evidence was more than sufficient to sustain Lough's conviction for causing pollution of water of the state. See *State v. D.J. Master Clean, Inc.* (1997), 123 Ohio App.3d 388, 394–395, 704 N.E.2d 301. Accordingly, Lough's argument is overruled.

{¶ 35} In light of the foregoing, we find no error in the trial court's decision denying appellants' Crim.R. 29(C) motion for acquittal for appellants' convictions for failing to prepare a hazardous-waste manifest, illegal transportation of hazardous waste, illegal disposal of hazardous waste, illegal storage of hazardous waste, and criminal endangering spanning both indictments, because those convictions were supported by sufficient evidence and were not against the manifest weight of the evidence. In addition, we find no error in the trial court's decision denying Lough's Crim.R. 29(C) motion for acquittal as it relates to his conviction for causing pollution of the waters of the state, because that conviction was also supported by sufficient evidence. Accordingly, appellants' first assignment of error is overruled.

{¶ 36} Assignment of Error No. 2:

{¶ 37} "The defendants were deprived of their constitutional right to the effective assistance of trial counsel."

{¶ 38} In their second assignment of error, appellants argue that they received ineffective assistance of trial counsel. We disagree.

{¶ 39} To prevail on their claim of ineffective assistance of counsel, appellants must show that their trial counsel's performance fell below an objective standard of reasonableness and that they were prejudiced as a result. *State v. Smith,* Warren App. No. CA2010–06–057, 2011-Ohio-1188, 2011 WL 882182, ¶ 63, citing *Strickland v. Washington* (1984), 466 U.S. 668, 687–688, 693, 104 S.Ct. 2052, 80 L.Ed.2d 674. The failure to make an adequate showing on either prong is fatal to appellants' claim of ineffective assistance of counsel. *State v. Bell,* Clermont App. No. CA2008–05–044, 2009-Ohio-2335, 2009 WL 1395857, ¶ 77, citing *Strickland* at 697.

---

4. Bales also testified that after Lough ordered him to dump the acidic materials into the storm drain, Lough informed him that they would "have the cleanest sewers in Fairfield."

{¶ 40} Appellants argue that they received ineffective assistance of counsel because their trial counsel failed to "strenuously argue" against the trial court's decision overruling their objection to certain trial testimony, failed to object to the admissibility of the test results "based on the state's failure to provide defense counsel with samples to do independent testing," and failed to have the "relevant portions" of a study conducted by the University of Florida read into evidence, which, according to them, would have allowed the jury to "unambiguously [see] that both the sample collection method and the testing procedures performed * * * were done incorrectly and produced unreliable results."

{¶ 41} However, after a thorough review of the record, we find that the challenged actions are nothing more than the product of sound trial strategy that falls squarely within the wide range of reasonable professional assistance. *Strickland* at 689. As this court has consistently stated, "[e]ven debatable trial * * * tactics do not constitute ineffective assistance of counsel." *State v. Gleckler,* Clermont App. No. CA2009–03–021, 2010-Ohio-496, 2010 WL 541111, ¶ 10; *State v. Hoop,* Brown App. No. CA2004–02–003, 2005-Ohio-1407, 2005 WL 694545, ¶ 20; *State v. Conway,* 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101. Therefore, the challenged actions amounting to nothing more than a product of sound trial strategy, appellants simply cannot show that their trial counsels' performance fell below the objective standard of reasonableness. Accordingly, appellants' second assignment of error is overruled.

Judgment affirmed.

HENDRICKSON, P.J., and HUTZEL, J., concur.