[Cite as *State v. Dickershield*, 2021-Ohio-1912.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO/CITY OF HAMILTON, | : | |
| Appellee, | : | CASE NO. CA2020-07-075 |
| | : | O P I N I O N |
| - vs - | | 6/7/2021 |
| | : | |
| TAYLOR S. DICKERSHEID, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM HAMILTON MUNICIPAL COURT
Case No. 20CRB00794

Laura R. Gibson, City of Hamilton Prosecuting Attorney, 345 High Street, Hamilton, Ohio 45011, for appellee

Alexander, Wagner & Kinman, Maxwell D. Kinman, 423 Reading Road, Mason, Ohio 45040, for appellant

**BYRNE, J.**

{¶ 1} Taylor Dickersheid appeals from his conviction for domestic violence in the Hamilton Municipal Court. As detailed below, we conclude that the state presented competent and credible evidence of Dickersheid's guilt and affirm his conviction.

{¶ 2} In December 2019, city of Hamilton police charged Dickersheid with domestic

violence against Tristan Young. The matter proceeded to a bench trial.

**Young's Testimony**

{¶ 3} Young testified that she was Dickersheid's girlfriend and that they had, for six months, lived together in a rented room at a residence located on South 8th Street in Hamilton. Bryce Butler owned the home and also resided there. Young and Dickersheid had previously lived in an upstairs bedroom in the residence. But on December 13, 2019, they moved to a room on the lower level.[1]

{¶ 4} That day, Young and Dickersheid were arguing. Dickersheid had thrown Young's dog and had also gone through her phone and saw messages from a male friend. Young told Dickersheid she was leaving and began to gather her things. However, Dickersheid would not let her leave. Young stated, "[w]hen I grabbed my things, he drug them out of my hands, took my phone so I couldn't call anyone." Additionally, Dickersheid told her he was going to break all of her things. He threw a full length mirror at her, which she caught and threw onto the ground.

{¶ 5} Dickersheid blocked the door to prevent her from leaving the room. As she attempted to get past him, he shoved her back with one hand. It was not a "playful" shove; it was enough force to move her back and "was to make sure I did not make it out of that room." The shove caused her to trip and twist her ankle.

{¶ 6} Young also alleged that Dickersheid had a gun, which he was waving around. He pointed the gun at her and threatened to shoot her if she left. Young described the gun as a "pretty big" "all black gun" with a "long handle and a long front." The state produced a photograph of a gun and Young identified it as the gun in Dickersheid's possession. The photograph depicts a distinctive black, AR-15 style pistol with a mounted scope.

---

1. There was some confusion at trial regarding whether the incident occurred on December 13 or 20. Based upon the record, it appears that the incident occurred on December 13.

{¶ 7} Young stated that Dickersheid's mother called his phone during the argument. Young was able to answer it before Dickersheid could stop her. She told Dickersheid's mother that they were arguing and that he was not letting her leave the room. Dickersheid left the residence after he learned that the police had been called.

{¶ 8} On cross-examination, Dickersheid's counsel asked Young if she had sent Dickersheid a Snapchat the next day "saying you were forced to make these allegations." Young denied sending such a message. When asked if her father disliked Dickersheid, Young stated her father had never met him.

**Police Officer's Testimony**

{¶ 9} A city of Hamilton police officer testified that he responded to a call to a residence where it was alleged that a person was being held hostage with a gun. He found Young outside the residence sitting in a car. Police recovered a gun from the residence. The officer confirmed that the photograph of the firearm that Young had earlier identified was the same firearm recovered at the residence. It was located in an upstairs bedroom, the first room on the left.

**Dickersheid's Testimony**

{¶ 10} According to Dickersheid, on the day of the incident, he was with Young in his downstairs room. He claimed that Young did not live at the residence, that she only stayed there three or four nights a week.

{¶ 11} That day, Dickersheid saw that Young had been talking to another man on her phone, which started an argument. He told her to leave. She started packing her stuff, and they were arguing, and then "the glass [from the mirror] got broke all over my floor and I told her, you're not leaving until you pick up the glass." He admitted that he stood in the doorway to prevent Young from leaving until she picked up the glass.

{¶ 12} Dickersheid then alleged that Young called his mother on the phone.

Dickersheid spoke to his mother, who told him to let Young leave, so he moved out of the doorway. Dickersheid then stated that Young called her mother or father and walked outside. According to Dickersheid, Young left "all her stuff" in the residence and was "outside by her car not leaving, talking to her mom and her mom is telling her to stay there and wait for the police to get there."

{¶ 13} Dickersheid then stated that he went to his mother and stepfather's house to cool down. The three of them then drove him back to his residence and they observed that police were there. His mother and stepfather then went and spoke with the police officers while he sat in the vehicle.

{¶ 14} Dickersheid denied physically touching Young during the argument. He denied threatening her with a gun, stated he did not own a gun, and though Butler did own a gun, he had no access to it. Dickersheid explained that Butler's younger sister was staying with them that night and for safety reasons, Butler had locked the gun in a room belonging to yet another roommate, "Shamar," because that was the only room in the residence with a lock on the door.

{¶ 15} Dickersheid claimed that a day after the incident, he received a Snapchat from Young. He introduced an exhibit that consisted of a photograph of the screen of a cell phone, which Dickersheid stated was his cell phone.

{¶ 16} The Snapchat message stated:

> You think dads going to let me leave. Just tell your attorney I
> was literally forced to do this shit. He can privately call me. I
> am being forced to be home. Forced to not call even. Forced
> to put someone I love in jail for something that didn't happen.
> I'm trapped Taylor. Why do you think I never went home.

{¶ 17} Above the alleged Snapchat from Young, there was a separate message that appeared to contain passwords.

{¶ 18} On cross-examination, the state asked Dickersheid how the mirror broke.

Dickersheid claimed he could not recall how the mirror broke:

> She – when the mirror got broke – the mirror got broke way before she even like started getting her stuff. I don't know. I can't remember exactly how the mirror got broke, but when the mirror broke, I know I was like, I was mad and I didn't want her to leave until the glass got cleaned up.

The state also asked Dickersheid about the Snapchat message appearing to contain passwords. Dickersheid admitted that they were passwords for "Netflix or something." The state asked Dickersheid if they were actually Young's password to Snapchat. He denied this and stated that they were for "Netflix and Hulu and Disney Plus."

**Dickersheid's Mother's Testimony**

{¶ 19} Dickersheid's mother, Amber Conerly, testified. Conerly said that she received a phone call from Young's cell phone number and when she answered it she could hear Young and her son arguing. Dickersheid told Conerly, "she is not leaving until she cleans up this glass that she just broke," referring to Young. Conerly told Dickersheid to let Young gather her stuff and leave. Conerly listened to them continue to argue and never heard Young make any statements about being pushed or any physical contact occurring. Eventually Conerly hung up. Ten minutes later, Dickersheid knocked at her door.

{¶ 20} Conerly stated that she received a text message from Dickersheid's ex-girlfriend saying that Dickersheid should not go home because the police were there. So Conerly, her husband, and Dickersheid drove to the home to "find out what was going on." Before arriving at the residence, they dropped Dickersheid off on the corner of his street and continued on towards the residence. Conerly stayed in the car while her husband spoke to police.

**Butler's Testimony**

{¶ 21} Butler confirmed that he owned the firearm identified by Young. He stated that he left the gun in Shamar's room that evening because his "baby sister" was staying

- 5 -

with him.  He had to leave the residence to check on his grandmother.  So he put his sister down in his bedroom, and placed the gun on the bed in Shamar's room, which he described as his "spare bedroom," and locked the door.  He left the key under the rug in his bedroom. Butler described the location of Shamar's room as follows, "[s]o if you go up the stairs, there is a little spare bedroom to the left * * *."

{¶ 22} Butler left to go see his grandmother and subsequently received a call from Shamar complaining that his door was locked and that he needed to retrieve some clothes. Butler told him to get the key and to make sure he locked the door when he was done.  But Shamar did not lock the door and just shut it.  Butler returned home to find police at his residence.

### Trial Court's Decision

{¶ 23} In announcing its decision, the court found that the state had proven that Young was a family or household member and that Dickersheid had caused and attempted to cause physical harm to Young.  The court found that Young had provided truthful testimony and that nothing that occurred during the trial made the court question that conclusion. On the other hand, the court found that Dickersheid was not being honest. The court specifically noted the suspect nature of Dickersheid's claim that he could not remember how the mirror was broken.  The court also observed that Dickersheid had run away from the scene and effectively hid from the police.  Accordingly, the court found Dickersheid guilty of domestic violence.

### Analysis

{¶ 24} Dickersheid appeals, raising two assignments of error.

{¶ 25} Assignment of Error No. 1:

{¶ 26} THE TRIAL COURT IMPROPERLY FOUND THE APPELLANT GUILTY OF DOMESTIC VIOLENCE WHEN THE VICTIM WAS NOT A FAMILY OR HOUSEHOLD

MEMBER.

{¶ 27} Dickersheid contends that the court erred in finding that Young was a "family or household member" for purposes of the domestic violence statute.[2] Dickersheid principally bases his argument on a claimed lack of evidence of cohabitation.

{¶ 28} Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 29} A manifest weight of the evidence challenge, on the other hand, examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* An appellate court will overturn a conviction due to the manifest weight of the

---

2. Dickersheid does not specify whether he is challenging the sufficiency or weight of the evidence. We presume a challenge to both.

evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.* at ¶ 15. A "determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones,* 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

{¶ 30} The court convicted Dickersheid of domestic violence in violation of R.C. 2919.25(A), which provides that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." A "family or household member" is, among others, "a person living as a spouse" who "is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question." R.C. 2919.25(F)(1)(a)(i) and R.C. 2919.25(F)(2).

{¶ 31} For purposes of R.C. 2919.25(F)(2), "the essential elements of 'cohabitation' are (1) sharing of familial or financial responsibilities and (2) consortium." *State v. Williams*, 79 Ohio St.3d 459, 465 (1997); *State v. Perkins*, 12th Dist. Fayette No. CA2009-10-019, 2010-Ohio-2968, ¶ 12. In *Williams*, the Ohio Supreme Court listed several factors to guide factfinders in determining whether cohabitation exists:

> Possible factors establishing shared familial or financial responsibilities might include provisions for shelter, food, clothing, utilities, and/or commingled assets. Factors that might establish consortium include mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, and conjugal relations.

*Williams* at 465. "These factors are unique to each case and how much weight, if any, to give to each of these factors must be decided on a case-by-case basis by the trier of fact." *Id.*

{¶ 32} Upon review, we find that the record contains competent and credible evidence of both shared familial or financial responsibilities and consortium. Young testified that she was Dickersheid's girlfriend and had lived with him at the South 8th Street

residence for approximately six months prior to the incident. She stayed at the residence every day and slept there at night. She paid $100 in rent, monthly, to Butler.

{¶ 33} Young stated, and Dickersheid agreed, that the full-length mirror was Young's mirror. That Young had a full-length mirror at the residence is strongly indicative of cohabitation. Moreover, Young testified that she had other personal items that she was attempting to gather before Dickersheid stopped her from leaving. Dickersheid did not dispute that Young had personal items at the residence and repeatedly admitted that Young was gathering her belongings during their argument. He stated, "I told her to get out, get all of your stuff and leave. And she started packing her stuff * * *." Other factors also weighed towards a finding of consortium, including Dickersheid's admission that he and Young ate together, hung out, watched television, slept together, and had sex at the residence.

{¶ 34} During his testimony, Dickersheid claimed that Young "didn't live with me," that she just spent three or four nights a week at the residence, and that it was not her permanent address. However, the court found that Dickersheid lacked credibility as opposed to Young, who it found credible. Dickersheid also points to Young's testimony that she listed her father's home, rather than the South 8th Street residence, as her address on a statement she provided to police. Young explained that she did so "out of habit." This explanation is credible; it is not unusual that a young adult would list a parent's home as an address, despite living outside of the parental home.[3] Moreover, given that she was attempting to leave the residence and Dickersheid, it is conceivable she no longer considered the South 8th Street residence her address.

{¶ 35} For the foregoing reasons, we find that the trial court did not lose its way in

---

3. The record reflects that Young was 19 years old on the date of the incident.

concluding that Young was a family or household member for purposes of the domestic violence statute.  Our conclusion with respect to the weight of the evidence is dispositive as to the issue of the sufficiency of the evidence.  *Jones* at ¶ 19.  We overrule Dickersheid's first assignment of error.

{¶ 36} Assignment of Error No. 2:

{¶ 37} THE TRIAL COURT IMPROPERLY FOUND THAT THE EVIDENCE SUPPORTED A CONVICTION.

{¶ 38} Dickersheid contends that his domestic violence conviction was contrary to the manifest weight of the evidence.  Dickersheid acknowledges that Young testified that he pushed her in the chest, which push caused an ankle injury with no bruising.  He seems to minimize this, characterizing Young as being "just hurt."  Dickersheid argues that the evidence did not support a conviction because he disputed Young's testimony and his denial is supported by the Snapchat message in which Young allegedly told him that her father made her make the accusations against him.  Additionally, Dickersheid notes the fact that Young was in a car on the phone when the police arrived, and the absence of any other witnesses who observed any assault or attempted assault.

{¶ 39} As stated previously, the state was required to prove that Dickersheid knowingly caused or attempted to cause physical harm to Young.  The Revised Code defines "physical harm" as "any injury, illness, or other physiological impairment, regardless of its gravity or duration."  R.C. 2901.01(A)(3).

{¶ 40} Upon review, we find that the state presented competent and credible evidence that Dickersheid caused and attempted to cause Young physical harm.  Young's testimony that Dickersheid shoved her in a non-playful manner, which knocked her backwards and caused an ankle injury, established physical harm.  That the injury did not result in a bruise is insignificant.  The state need only prove injury or physiological

impairment, "regardless of its gravity." R.C. 2901.01(A)(3). Additionally, Young's testimony that Dickersheid threw a mirror at her established an attempt to cause physical harm.

{¶ 41} Though Dickersheid denied pushing Young or throwing the mirror, Dickersheid's mere denial does not establish the type of "extraordinary circumstances" where the evidence "weighs heavily in favor of acquittal." *Barnett*, 2012-Ohio-2372 at ¶ 15. Nor does his denial gain persuasiveness because Young was using her phone in her car when the police arrived, as there are numerous reasons for her behavior. Likewise, the absence of other witnesses to Dickersheid's assault and attempted assault of Young lacks any significance, as the argument occurred in a bedroom with no one else present.

{¶ 42} With respect to the alleged Snapchat message, Young denied having sent it. The state argued that Dickersheid obtained Young's Snapchat password in order to fabricate the message. Regardless, the court found Young credible despite the Snapchat message, and we defer to the trial court's evaluation, as the trier of fact, of Young's credibility.

{¶ 43} We further note that the trial court's determinations regarding Young's credibility and Dickersheid's lack of credibility are supported by much of the evidence in the case. *See Barnett*, 2012-Ohio-2372, at ¶ 14 (in a manifest weight analysis, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of the witnesses to determine whether the trier of fact clearly lost its way). Young provided a reasonable explanation for why and how the mirror broke, i.e., Dickersheid said he would break her things and, correspondingly, threw her mirror at her. Dickersheid's claim that he did not know how the mirror broke is not credible, particularly when he admitted that he was so upset about the broken glass that he stood in the doorway to prevent Young from leaving, and only moved out of the way when his mother told him to move. Dickersheid claimed he never physically touched Young, yet the facts indicate he

fled the scene and later effectively hid from police.  And on this issue, Dickersheid and his mother presented inconsistent stories about visiting the residence after the police arrived. Based on the foregoing, the court did not lose its way in convicting Dickersheid of domestic violence.  We overrule Dickersheid's second assignment of error.

{¶ 44}  Judgment affirmed.

S. POWELL, P.J., and HENDRICKSON, J., concur.