[Cite as *State v. Wallace*, 2023-Ohio-1524.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2022-08-021 |
| | : | O P I N I O N |
| - vs - | | 5/8/2023 |
| | : | |
| JASON ALLEN WALLACE, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
Case No. CRI 21-500-104

Andrew T. McCoy, Clinton County Prosecuting Attorney, and Robert C. Logsdon, Assistant Prosecuting Attorney, for appellee.

The Law Office of John D. Hill, LLC, and John D. Hill, Jr., for appellant.

**HENDRICKSON, P.J.**

{¶1} Appellant, Jason Allen Wallace, appeals from his conviction in the Clinton County Court of Common Pleas for receiving stolen property. For the reasons set forth below, we affirm his conviction.

{¶2} On April 7, 2021, Douglas Eastes, a lieutenant with the Clinton County Sheriff's Office, received an anonymous phone tip that a stolen utility truck, possibly a DP&L

truck, was being stored at Wallace's residence on State Route 350 in Cuba, Clinton County, Ohio. The anonymous caller informed Lt. Eastes that Wallace and Michael King were "parting out" the truck and that one of the parts had been sold or given to an individual in Greenfield, Ohio. Lt. Eastes looked at stolen vehicle reports. Though he did not find a report of a stolen DP&L truck, he did find a report arising out of Highland County concerning a stolen Ford F-450 utility truck belonging to Aaron Baldwin.

{¶3} Lt. Eastes and another officer went to Wallace's residence to look into the matter. When they drove up to the property, they saw a Ford F-250 pickup truck ("F-250") parked in the driveway. They also saw that the sliding door to a detached three-bay garage was open. Wallace exited the garage through the sliding door before closing it. Lt. Eastes approached Wallace and informed him of the report of a stolen utility truck. Wallace denied there was a stolen vehicle in his garage, stating that the only two vehicles in the garage were his own pickup truck and a car that belonged to a friend. When Lt. Eastes asked for permission to enter the garage, Wallace refused the lieutenant access.

{¶4} Lt. Eastes spoke with Paul Conger, who was renting the house on Wallace's property. Conger advised Lt. Eastes that he did not have access to the garage. While speaking with Conger, Lt. Eastes observed a second door to the garage, which was located on the opposite side of the building. The door was standing wide-open. Through the open door, Lt. Eastes observed a utility truck. When he informed Wallace that he could see a utility truck, Wallace acted surprised and stated he had not noticed the vehicle when he was in the garage moments earlier. Lt. Eastes again asked Wallace for permission to enter the garage, and this time, Wallace consented. Wallace entered the garage with Lt. Eastes.

{¶5} From the natural light that came through the open door, Lt. Eastes was able to observe three vehicles inside the garage: a car, a smaller pick-up truck, and a large, heavy-duty utility pickup truck ("utility truck"). According to Lt. Eastes, there was no way

Wallace would not have seen the utility truck when he was in the garage, as the garage was an open space, not separated by walls. Though there was enough natural light to see what was inside the garage, there was not enough light to see the small letters comprising the utility truck's vehicle identification number (VIN). Lt. Eastes asked for the building's lights to be turned on. Wallace claimed there were no lights in the garage. Conger, however, was able to plug in lights to illuminate the garage.

{¶6} Lt. Eastes commented to Wallace that since Wallace had never seen the utility truck, there would be no reason for his fingerprints to be found anywhere on the vehicle. Wallace then began to touch the utility truck and started opening up toolboxes and other items on the truck. He did so despite Lt. Eastes orders to stop touching the vehicle. Wallace was eventually removed from the garage.

{¶7} Lt. Eastes examined the utility truck, noticing that the VIN plate on the utility truck had been tampered with and the rocker panel on the driver's side door, which holds a secondary VIN, had been cut off. The utility truck's registration paperwork was inside the truck. The registration paperwork had a license plate number different from the license plate that was physically attached to the utility truck. Lt. Eastes ran the license plate number from the registration paperwork, and it came back as the vehicle Baldwin had reported stolen. The number from the license plate that was physically attached to the utility truck was also run, and it came back as being registered to an F-250 owned by Tamara Grey, who Lt. Eastes knew was King's girlfriend. The F-250 to which the license plate was registered was parked in the driveway outside Wallace's garage. The VIN plate for the F-250 parked in the driveway had been removed and the rocker panel had also been cut off. The utility truck and the F-250 were secured into evidence and transported back to the sheriff's office.

{¶8} Lt. Eastes then went to discuss what he had found with Wallace. However,

he was advised by Conger that Wallace had left the premises on foot. Wallace was tracked down and brought back to his garage by another officer. Wallace told Lt. Eastes that he had left the premises because he had to use the restroom and he wanted to get himself an ice cream cone. Lt. Eastes advised Wallace of his *Miranda* rights and questioned him about the utility truck. Wallace denied any knowledge of the utility truck, stating he "didn't know it was in there, [and] had no information that he could add at that time." At no point in time during any interaction Lt. Eastes had with Wallace did Wallace claim that the garage was rented to Conger or that Conger had exclusive control over the garage or its contents.

{¶9} Wallace was ultimately indicted on one count of receiving stolen property in violation of R.C. 2913.51(A) and (C), a felony of the fourth degree. He pled not guilty to the charge and waived his right to a jury trial. At a bench trial that commenced on August 8, 2022, Wallace stipulated that the utility truck was owned by Baldwin and that Baldwin had not given permission for anyone in Cuba to have possession of it. The state then presented testimony from Lt. Eastes about the investigation into the utility truck and the subsequent search of the truck after it was found in Wallace's garage. The state also presented testimony from Rick Munk, a special agent with the National Insurance Crime Bureau, who examined the truck in coordination with the Clinton County Sheriff's Office. Munk specializes in construction theft, vehicle theft, and fraud investigations and frequently works with law enforcement in identifying stolen vehicles. After examining the F-250 and the utility truck, and noting that the VIN plate that should have been on the F-250 was attached to the dash of the utility truck and that it was attached poorly with glue, Monk opined that a "VIN flip" had occurred. He explained that a VIN flip is a common practice used by criminals to try to obfuscate the identity of a stolen vehicle. Photographs of Wallace's garage, the utility truck, the F-250, and the two vehicles' swapped VIN plates were admitted into evidence.

{¶10} Wallace presented a defense that it was Conger who had received and

retained possession of the stolen utility truck. He did so through his cross-examination of the state's witnesses and by calling his father, Randy Wallace, as a witness. Randy testified that Conger rented both the residence and the garage on Wallace's property. According to Randy, Conger had exclusive possession of the garage, Conger controlled the locks on the garage, and Wallace had to ask Conger for permission to get into the garage when he needed access.

{¶11} After considering the evidence introduced at trial, the trial court found Wallace guilty of receiving stolen property. The court subsequently sentenced Wallace to a 12-month prison term. The sentence was run concurrently to a two-year prison sentence imposed in Clinton Common Pleas Case No. CRI 21-500-225.

{¶12} Wallace appealed his conviction, raising two assignments of error for review. As the assignments of error are related, we address them together.

{¶13} Assignment of Error No. 1:

{¶14} [WALLACE'S] CONVICTION FOR RECEIVING STOLEN PROPERTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶15} Assignment of Error No. 2:

{¶16} [WALLACE'S] CONVICTION FOR RECEIVING STOLEN PROPERTY WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶17} Wallace contends his conviction is not supported by sufficient evidence and is against the manifest weight of the evidence because the state failed to prove that he "was in any way involved with the theft and subsequent disassembly of the utility truck, or * * * that he was even aware that it was in the garage." Wallace contends that the weight of the evidence introduced at trial demonstrates that it was Conger, not Wallace, who had control over the garage where the stolen truck was found.

{¶18} Whether the evidence presented at trial is legally sufficient to sustain a verdict

is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶19} A manifest weight of the evidence challenge, on the other hand, examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66. "While appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, 'these issues are primarily matters for the trier of fact to decide.'" *State v. Barnes*, 12th Dist. Brown No. CA2010-06-009, 2011-Ohio-5226, ¶ 81, quoting *State v. Walker*, 12th Dist. Butler No. CA2006-04-085, 2007-Ohio-911, ¶ 26. An appellate court, therefore, will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.*, citing *Thompkins*, 78 Ohio St.3d at 387. Furthermore,

although the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different, "[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

{¶20} Wallace was convicted of receiving stolen property in violation of R.C. 2913.51(A), which provides that "[n]o person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through the commission of a theft offense." If the property involved is a motor vehicle, the offense constitutes a felony of the fourth degree. R.C. 2913.51(C).

{¶21} "A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). "Absent an admission by a defendant, the question of whether the defendant had reasonable cause to believe an item was stolen can only be proved by circumstantial evidence." *State v. Rivera*, 12th Dist. Butler No. CA2012-11-220, 2013-Ohio-3203, ¶ 9. "[T]he trier of fact 'may infer guilty knowledge when the defendant's possession of recently stolen property either goes unexplained or is not satisfactorily explained in the context of the surrounding circumstances, as shown by the evidence.'" *State v. Pangburn*, 12th Dist. Clermont No. CA2015-11-095, 2016-Ohio-3286, ¶ 15, quoting *State v. Emery*, 6th Dist. Lucas No. L-11-1228, 2013-Ohio-208, ¶ 18.

{¶22} After reviewing the record, weighing inferences and examining the credibility of the witnesses, we find that Wallace's conviction for receiving stolen property is supported by sufficient evidence and is not against the manifest weight of the evidence. Contrary to Wallace's assertions, the state did not need to prove that Wallace stole the utility truck or was involved in the disassembly of the utility truck. Rather, the state only had to establish that Wallace received or retained possession of the utility truck knowing or having reasonable cause to believe that it had been obtained through the commission of a theft

offense. Lt. Eastes' and Munk's testimony, as well as the photographs of the two vehicles and their swapped VIN plates, established all the essential elements of the offense beyond a reasonable doubt.

{¶23} Lt. Eastes' testimony established that the stolen utility truck was found in Wallace's garage—the garage that Wallace was found exiting moments before law enforcement arrived on scene. The utility truck had a swapped VIN plate poorly glued into place on the dash, its rocker panel had been cut off, and the registration paperwork in the vehicle listed the owner as Baldwin. As Lt. Eastes explained, there was no way Wallace would not have been able to see the utility truck when he was in the garage, as the garage was an open space that was not separated by walls and the utility truck was plainly visible in natural light. Wallace acted surprised that the utility truck was in the garage, claiming he had not seen the large, heavy-duty utility truck when he was in the garage moments earlier. He then proceeded to touch the utility truck in multiple places after being told that it would be processed for fingerprint evidence, thereby giving rise to a reasonable inference that he was concerned that his prints were already on the vehicle and he wanted to try to reduce the value of any fingerprint evidence collected. Wallace's decision to leave the scene—allegedly to use the bathroom and get ice cream—in the middle of the officers' investigation into the utility truck, was further evidence of his guilt. *See State v. Grindstaff*, 12th Dist. Clermont No. CA2013-09-074, 2014-Ohio-2581, ¶ 22 ("Evidence of flight is admissible to show consciousness of guilt"). If Wallace had not known or if he had not had reasonable cause to believe that the utility truck was stolen, Wallace would not have pretended ignorance over the truck being in the garage, would not have intentionally placed his fingerprints on the truck, and he would not have fled from the scene. Under the circumstances of this case, the trial court, as the trier of fact, was entitled to infer that Wallace knew the utility truck had been stolen.

**{¶24}** Wallace argues that the evidence establishes that it was Conger who had control over the garage and was responsible for the utility truck's presence in the garage. He points out that it was Conger who knew how to illuminate the garage and there was testimony from his father that Conger rented the garage and had exclusive use of it. The court heard Randy's testimony and weighed it against the evidence offered by the state. "In a bench trial, the trial court acts as the factfinder and determines both the credibility of the witnesses and the weight of the evidence." *State v. Lowry*, 12th Dist. Warren Nos. CA2019-07-070 and CA2019-07-071, 2020-Ohio-1554, ¶ 19. "[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony." *State v. Lunsford*, 12th Dist. Brown No. CA2010-10-021, 2011-Ohio-6529, ¶ 17. Here, the court ultimately found Lt. Eastes' and Munk's testimony more credible than Randy's testimony. As the trier of fact was in the best position to judge the credibility of the witnesses, we will not disturb the trial court's finding in regard to which version of events was credible and which was not. *State v. Martino*, 12th Dist. Butler No. CA2017-09-139, 2018-Ohio-2882, ¶ 13.

**{¶25}** Accordingly, given the evidence admitted at trial, we find that Wallace's conviction for receiving stolen property is supported by sufficient evidence and is not against the manifest weight of the evidence. Wallace's first and second assignments of error are overruled.

**{¶26}** Judgment affirmed.


PIPER and BYRNE, JJ., concur.