[Cite as *State v. Halbert*, 2023-Ohio-4471.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2023-03-027 |
| | : | O P I N I O N |
| - vs - | | 12/11/2023 |
| | : | |
| EDWARD HALBERT, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 20CR37130

David P. Fornshell, Warren County Prosecuting Attorney, Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Christopher Bazeley, for appellant.

**M. POWELL, J.**

{¶ 1}   Appellant, Edward Halbert, appeals his conviction and sentence in the Warren County Court of Common Pleas after a jury found him guilty of murder, felonious assault, and reckless homicide.

{¶ 2}   On December 19, 2019, Kelvin Bunton, an inmate at the Warren County

Correctional Institution ("WCCI"), was placed in a cell with Halbert. During a routine check of the cell, a corrections officer found Bunton lying on the floor with a bed sheet covering his body. Halbert informed the corrections officer that Bunton was dead. After securing Halbert and removing the bed sheet covering Bunton, the corrections officer discovered that Bunton was unresponsive, with bed sheets tied around his hands and neck. While emergency responders attempted to revive Bunton, Halbert was questioned by a therapist from WCCI. Halbert informed the therapist that he assisted Bunton in a fake suicide attempt, during which he tied Bunton's hands behind Bunton's back, tied a sheet around Bunton's neck, and pulled the sheet tighter until he felt no resistance from Bunton. According to Halbert, he and Bunton conceived the suicide plan to ensure Bunton's transfer to a mental health facility in Allen County, Ohio. Despite extensive efforts by medical personnel, Bunton was unable to be revived and was later declared dead at a local hospital.

{¶ 3} As a result of the above, Halbert was indicted on one count of murder, an unclassified felony, one count of felonious assault, a second-degree felony, and one count of reckless homicide, a third-degree felony. Halbert pled not guilty to the charges and the matter proceeded to a three-day jury trial on February 27, 2023.[1]

{¶ 4} At trial, the testimony revealed that Halbert's cell, cell 104, is within the Residential Treatment Unit of WCCI ("RTU"). While the RTU is where inmates with mental health disabilities are housed, certain cells within the unit, including cell 104, are used for segregation purposes. On December 19, 2019, Bunton was moved to cell 104 for disciplinary reasons. Neither Halbert nor Bunton was happy with Bunton's new placement. At some point, Howard Hill, a WCCI corrections officer working in the RTU that day, heard

---

1. Between Halbert's indictment in August 2020, and his trial in February 2023, the trial court held several hearings pertaining to Halbert's competency to stand trial. Ultimately, in February 2023, the trial court found Halbert was competent to stand trial.

Bunton kicking the door of his cell. Hill explained that it was not unusual for inmates to kick their cell door and testified that neither Bunton nor Halbert seemed in distress when he investigated the situation. Bunton stopped kicking the cell door when asked by Hill.

{¶ 5} Part of Hill's duties as a corrections officer included completing "range checks" of the unit every 30 minutes, during which officers visit each cell and "lay eyes" on each inmate within the cell. At approximately 3:09 p.m., Hill conducted a range check of the RTU. Upon looking into cell 104, Hill observed a body on the floor covered with a sheet. Halbert stood to the left of the cell's window, and informed Hill that "[Bunton]'s dead." Hill indicated that, up until that point, no one from cell 104 had asked for help, banged on the door, or tried to get his attention. Instead, Hill described Halbert as "very calm" and "monotone" when he informed Hill of Bunton's death. At that point, Hill called for backup.

{¶ 6} After restraining and removing Halbert, corrections officers entered cell 104 to examine Bunton. The officers removed the sheet and discovered Bunton lying on the floor with a torn bed sheet tied "extremely tightly" around his neck. Bunton had blood on his cheek and vomit near his mouth. The bed sheet was tied with multiple knots and was so tight that Hill could not get his fingers between the sheet and Bunton's neck. Officers called a medical emergency after discovering that Bunton was unresponsive, did not have a pulse, and was not breathing. While waiting for the medical staff, Hill's backup retrieved a "cut down device" to remove the bed sheet from Bunton's neck. After removing the bed sheet from Bunton's neck, the officers began CPR until medical personnel arrived.

{¶ 7} A nurse from WCCI and a paramedic-firefighter from Turtlecreek Township Fire Department detailed the extensive lifesaving measures provided to Bunton that day. Despite their efforts, including continued CPR, the attempted use of an AED, and multiple shots of an adrenaline drug, Bunton remained unresponsive and never exhibited any signs of life. Bunton was transported to a local hospital, where he was pronounced dead at 4:08

p.m.

{¶ 8} While medical personnel tended to Bunton, an activity therapist at WCCI placed Halbert in a private cell. At that time, Halbert confirmed the therapist was not wearing a wire and proceeded to explain what transpired in cell 104 that afternoon. According to Halbert, Bunton wanted to leave WCCI and go to "Oakwood." To do so, Bunton indicated he wanted to "fake killing himself" so that WCCI would send him to a medical facility. Halbert then told Bunton that he could help Bunton, but that "[they] ha[d] to make [it] look real or they're not going to take [Bunton] seriously." Halbert clarified to Bunton that he could die during the process. Bunton accepted Halbert's offer to help.

{¶ 9} At that point, Halbert had Bunton get on his knees and put his hands behind his back. Halbert proceeded to wrap a bed sheet around Bunton's hands. Bunton began to get "squeamish" and "hesitant," but Halbert assured him that if he wanted Halbert's help, they needed to "do this right" or "they won't believe you." After Bunton calmed down, Halbert finished tying the sheet around his hands. Halbert then tied a second bed sheet around Bunton's neck and "started pulling tighter and tighter," as he watched Bunton "squirming around and fighting for air." Bunton then fell forward to the floor and Halbert put his foot on Bunton's back and "pulled upwards[,] ensuring that he had a tight enough grip." Halbert indicated he pulled and squeezed the sheet as hard as he could until he felt no resistance. After he could tell that Bunton had passed out, Halbert flipped Bunton's body over, and ensured Bunton was either dead or passed out by "jump[ing] up and down on top" of Bunton's body and throat to "make sure that there was nothing left." At trial, the therapist testified that Halbert demonstrated his actions for the therapist, who demonstrated the same for the jury during his testimony.

{¶ 10} After confirming Bunton was unconscious, Halbert placed a sheet over Bunton's body, sat on the bed, and waited for the corrections officers to come by. The

therapist testified Halbert was unremorseful while discussing the encounter and was unconcerned with Bunton's well-being.

{¶ 11} Halbert was later interviewed by Ohio State Highway Patrol Trooper Lonnie Butler. A recording of the interview was played for the jury and admitted into evidence. During the interview, Halbert recited a similar story, including that Bunton wanted to be transferred to a mental health facility in Allen County. Halbert offered to help secure Bunton's transfer, but told Bunton he would have to "play with his life." Halbert then told the trooper about the cellmates' suicide plan and described how he assisted Bunton by tying sheets around Bunton's neck and hands and pulling the sheet around Bunton's neck until he no longer felt any resistance. When Bunton stopped moving, Halbert realized he was dead. According to Halbert, although he intended to take Bunton's life during the incident, he believed Bunton would get his life back. Contrary to what Halbert had told the activity therapist, Halbert denied putting his foot on Bunton's back and did not describe jumping on Bunton's body.

{¶ 12} Dr. Russell Uptegrove, the Warren County Coroner, supervised Bunton's autopsy. Dr. Uptegrove described Bunton's injuries, including marks and bruising on his neck, a "massive amount" of hemorrhage and congestion in his eyes, hemorrhages in his eyelids, and petechial hemorrhages on his lips and gums. According to Dr. Uptegrove, the nature of the injuries was consistent with strangulation and inconsistent with a suicide or hanging. Based upon the autopsy findings and circumstances surrounding Bunton's death, Dr. Uptegrove concluded that Bunton's cause of death was strangulation, and that the manner of his death was a homicide.

{¶ 13} At the close of the state's case-in-chief, Halbert moved for acquittal pursuant to Crim.R. 29. The trial court denied the motion and Halbert proceeded to present two witnesses in his defense. The first witness, a WCCI corrections officer who was working in

- 5 -

the RTU on December 19, 2019, testified that Bunton was unhappy with his placement in cell 104, and that he had been screaming and kicking the cell door that day. The second witness, a psychologist from WCCI, detailed Bunton's extensive mental health issues, including repeated threats of self-harm at various institutions between March 2018 and September 2019.

{¶ 14} The jury found Halbert guilty of all charged offenses. Following the merger of the felonious assault and reckless homicide charges as allied offenses of similar import, the trial court sentenced Halbert to 15 years to life in prison for murder in violation of R.C. 2903.02(B). The trial court ordered Halbert's sentence for murder to be served consecutively to the sentence he was currently serving at the time of the offense.

{¶ 15} Halbert appealed his conviction and sentence, raising two assignments of error for review. For the ease of discussion, we will begin with Halbert's second assignment of error.

{¶ 16} Assignment of Error No. 2:

{¶ 17} HALBERT'S CONVICTIONS ARE NOT SUPPORTED BY LEGALLY SUFFICIENT EVIDENCE AND ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 18} Halbert argues that his conviction for murder is not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶ 19} Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-

10-026, 2012-Ohio-3205, ¶ 9. Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 20} On the other hand, a manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66. In reviewing the evidence, an appellate court must be mindful that the jury, as the original trier of fact, was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*, citing *Thompkins* at 387. Further, although the legal concepts of sufficiency of the evidence and weight of the evidence are quantitatively and qualitatively different, "[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

{¶ 21} Halbert was convicted of felony murder in violation of R.C. 2903.02(B), which provides that "[n]o person shall cause the death of another as a proximate result of the

offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]" The underlying felony for which Halbert was convicted was felonious assault in violation of R.C. 2903.11(A)(1), which prohibits one from knowingly causing serious physical harm to another. Pursuant to R.C. 2903.11(D)(1)(a), felonious assault is a felony of the second degree.

{¶ 22} On appeal, Halbert argues that his underlying conviction for felonious assault is against the manifest weight of the evidence because the testimony at trial proved he did not knowingly intend to cause Bunton serious harm as required by R.C. 2903.11(A). Instead, Halbert claims the evidence shows that Halbert merely intended to "help" Bunton by "fak[ing] a suicide attempt, not to harm" him. After our review of the record, we find no merit to Halbert's claims.

{¶ 23} A person commits felony murder with a felonious assault predicate when he knowingly causes serious physical harm to another, and that conduct is the proximate cause of another's death. *State v. Owens*, 162 Ohio St.3d 596, 2020-Ohio-4616, ¶ 9. Under the felony murder provision, the mens rea for felony murder is the intent that is required to commit the underlying predicate offense, in this case, felonious assault—therefore, knowingly. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶ 24} At trial, the state presented more than sufficient credible evidence that Halbert knowingly caused serious physical harm to Bunton when he strangled Bunton with a bed sheet until he lost consciousness and eventually died. As noted above, a WCCI therapist testified that he and Halbert had a conversation shortly after the incident. During that conversation, Halbert detailed the events leading up to Bunton's death, including that he

- 8 -

suggested he could help Bunton fake a suicide to facilitate his transfer to a mental health facility.  Halbert then tied Bunton's hands behind his back, wrapped and knotted a bed sheet around Bunton's neck, and pulled the bed sheet as tightly as he could.  When Bunton began squirming on the ground, struggling to breathe, Halbert used his foot to pull the sheet tighter until Bunton stopped resisting.  At that point, Halbert believed Bunton was dead, but confirmed he was not breathing by jumping on his body and throat.  Ultimately, Halbert's actions caused Bunton to spit out blood; left bruising on Bunton's neck and throat; and resulted in a "striking" amount of hemorrhaging in his eyes, lips, and gums.  At trial, it was undisputed that Halbert strangled Bunton with the bed sheet as described above, and that strangulation was the cause of Bunton's death.  When considering the nature of Halbert's actions, a reasonable juror could conclude that Halbert was aware that his conduct would probably cause serious physical harm to Bunton.

{¶ 25} Halbert claims his conduct was merely part of a scheme to secure Bunton's transfer to another facility.  However, Bunton's participation in the scheme in no way excuses Halbert's involvement in Bunton's death.  *See, e.g.*, *State v. Mitzel*, 11th Dist. Trumbull No. 3917, 1989 Ohio App. LEXIS 3680, *17-18 (Sept. 22, 1989) (affirming appellant's conviction for aggravated murder despite the victim's consent); *see also State Auto Ins. Co. v. Clear*, 12th Dist. Butler No. CA97-08-171, 1998 Ohio App. LEXIS 2783, *15 (June 22, 1998).  Furthermore, Halbert's actions after Bunton's incapacitation were inconsistent with his alleged plan to have Bunton revived and transferred.  Halbert did not immediately request medical assistance, gain the attention of the corrections officers, or perform CPR.  Instead, Halbert calmly covered Bunton's body with a bed sheet and waited for a corrections officer to check on their cell.  The jury was free to weigh this evidence against Halbert's alleged motive to "help" Bunton.

{¶ 26} Moreover, Halbert's comments after the incident and during his interview

indicate that Halbert knew Bunton would suffer serious physical harm as a result of their plan. Specifically, during his interview, Halbert made repeated comments regarding the potential consequences of the plan, including that Bunton could die; that Bunton would have to play with his life; that Bunton's suicide attempt had to look real; and that he intended to take Bunton's life. He made similar comments to the therapist immediately following the incident. Accordingly, it is apparent that Halbert knew that the suicide plan, would probably cause Bunton to sustain serious physical harm, including death.

{¶ 27} Based on the foregoing, we find there is sufficient credible evidence that Halbert knowingly caused serious physical harm to Bunton and that his conduct was the proximate cause of Bunton's death. As such, the jury was entitled to find beyond a reasonable doubt that Halbert committed the charged offenses of murder and felonious assault. Halbert's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. The jury did not lose its way and create such a manifest miscarriage of justice that Halbert's convictions must be reversed and a new trial ordered. Halbert's second assignment of error is overruled.

{¶ 28} Assignment of Error No. 1:

{¶ 29} THE TRIAL COURT ERRED WHEN IT IMPOSED A CONSECUTIVE SENTENCE WITHOUT CONSIDERING ALL OF THE R.C. 2929.14 FACTORS.

{¶ 30} In his remaining assignment of error, Halbert argues the trial court erred in imposing consecutive sentences without making the requisite findings at the sentencing hearing.

{¶ 31} A felony sentence is reviewed under the standard in R.C. 2953.08(G)(2). *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1. R.C. 2953.08(G)(2) states that an appellate court may modify or vacate a sentence if the court finds by clear and convincing evidence that "the record does not support the trial court's findings under relevant statutes

or that the sentence is otherwise contrary to law." *Id*.

{¶ 32} When imposing consecutive sentences, a sentencing court is required "to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, syllabus. R.C. 2929.14(C)(4) states:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender *and* that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, *and* if the court also finds any of the following:
>
> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

(Emphasis added.)

{¶ 33} "When imposing consecutive sentences, a trial court must state the required findings as part of the sentencing hearing, and by doing so it affords notice to the offender and to defense counsel." *Id*. at ¶ 29, citing Crim.R. 32(A)(4). "[A] word-for-word recitation of the language of the statute is not required," though, "and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld."

*Id.*

{¶ 34} In this case, it is undisputed that the trial court included all the necessary findings to support the imposition of consecutive sentences in its sentencing entry. However, Halbert contends the trial court failed to make the required proportionality finding at the sentencing hearing. *See State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, ¶ 253-260 (holding that the R.C. 2929.14[C][4] findings must be made at the sentencing hearing and incorporated into the sentencing entry); *State v. Jones*, 12th Dist. Brown No. CA2014-09-017, 2015-Ohio-2314, ¶ 25-26. The state concedes the trial court did not comply with R.C. 2929.14(C)(4) when it imposed consecutive sentences and claims the case must be remanded to the trial court for the sole purpose of engaging in the required analysis prior to imposing consecutive sentences.

{¶ 35} At the sentencing hearing, the trial court stated the following regarding its decision to impose consecutive sentences:

> On Count One the sentence is 15 years to life to run consecutive to his current sentence which I know is due to end not that long from now. The basis for the consecutive sentence is to protect the public and based on criminal history in the case.

Based upon this language, it is clear the trial court found that a consecutive sentence was necessary to protect the public from future crime by Halbert and that Halbert's history of criminal conduct demonstrates that a consecutive sentence is also necessary to protect the public from future crime by Halbert. However, the record does not reflect that the court addressed the required proportionality finding or engaged in the proportionality analysis and found that the seriousness of Halbert's conduct and the danger he posed to the public justified a consecutive sentence.

{¶ 36} The proportionality and criminal history findings differ in important respects and are addressed to different aspects of an offender's circumstances. The criminal history

finding concerns the likelihood of recidivism based upon the offender's criminal history. The proportionality finding is not concerned with recidivism but with the offender's conduct in the commission of the offenses for which he is being sentenced and the menace he presents to society, separate and apart from his propensity to recidivate. Pursuant to the proportionality finding, the sentencing court must assess the nature and gravity of the offender's conduct and evaluate what consecutive sentence appropriately reflects the severity of the conduct involved in the commission of the offenses and the threat the offender poses to public safety. This finding is intended to guide the sentencing court's discretion in crafting a sentence that is neither excessive nor overly lenient.

{¶ 37} To summarize, the main difference between these two findings lies in their focus. The proportionality finding aims to ensure that the consecutive prison term aligns with the seriousness of the offense and potential danger the offender presents to society. The criminal history finding recognizes the potential risk associated with an offender's criminal history and determines whether a consecutive sentence is necessary to safeguard the public from future crimes. The proportionality and criminal history findings are distinct, and we may not assume that finding one satisfies the other. As this court has previously noted, even if it is likely the trial court did consider the proportionality analysis of R.C. 2929.14(C)(4), "the statute does not permit us to infer its consideration in this case." *State v. Volz*, 12th Dist. Clermont No. CA2022-06-028, 2022-Ohio-4134, ¶ 13 (consecutive sentences contrary to law where the trial court did not make the proportionality finding mandated by R.C. 2929.14[C][4]).

{¶ 38} We therefore vacate that portion of the trial court's judgment imposing consecutive sentences and remand this matter to the trial court for resentencing. On remand, the trial court shall consider whether consecutive sentences are appropriate under R.C. 2929.14(C)(4), and if so, shall make the required statutory findings on the record at

resentencing and incorporate its findings into a sentencing entry. *See Bonnell*, 2014-Ohio-3177 at ¶ 37; *State v. Smith*, 12th Dist. Clermont No. CA2014-07-054, 2015-Ohio-1093, ¶ 16.

{¶ 39} Judgment affirmed in part, reversed in part, and the matter is remanded for the limited purpose of resentencing.

BYRNE, J., concurs.

PIPER, P.J., concurs in part and dissents in part.

**PIPER, P.J., concurring in part and dissenting in part.**

{¶ 40} I concur in overruling Halbert's second assignment of error. As pointed out, Halbert's conduct was inconsistent with a plan to "help" Bunton. Halbert intended to take Bunton's life which was reflected in his own statement and overwhelmingly supported by the facts. Regarding the first assignment of error, however, I respectfully dissent from the reversal and remand for purposes of resentencing. The trial court's sentence was not contrary to law and was supported by the record. Furthermore, if there was an error, which I do not agree there was, it was both invited and harmless.

### Sentence Based Upon Criminal History and Protecting Public

{¶ 41} Halbert (who never wanted a cellmate to begin with) tied his cellmate's hands behind his back and wrapped a sheet around his neck from behind. Halbert then braced his leg in the center of his cellmate's back using his strength and body weight to tighten the sheet so his cellmate could no longer breath; all this while the cellmate fought and struggled to survive. After the life was squeezed out of his cellmate, Halbert stomped on the cellmate's chest to ensure no air was left in his lungs. When the cell was eventually entered, Halbert calmly confirmed the cellmate was no longer alive. The jury convicted Halbert for his violence in killing Bunton and the trial court proceeded to sentence.

{¶ 42} The trial court noted that Halbert's time was nearly served for the crime that led to his original incarceration and also noted his criminal history. The trial court determined that in order to protect the public from Halbert's future criminal conduct it was necessary his sentence be served consecutively. No one suggested to the trial court that it had failed to sufficiently make the consecutive sentence findings pursuant to R.C. 2929.14(C)(4). The parties had no comments and no objections to the R.C. 2929.14(C) findings or the sentence. The necessity supporting a consecutive sentence had been expressed on the record by the court.

{¶ 43} A few weeks later the trial court had a supplemental sentencing hearing because it had not made a finding that Halbert was to be categorized as a repeat violent offender. Although expressly given the opportunity to object or place concerns on the record, neither party suggested the consecutive sentence findings were insufficient or lacking, and no one suggested the findings in the entry were incorrect. This trial judge is approachable, frequently confers with counsel on the record, and often invites counsel for comment or to make a record.

{¶ 44} Despite multiple opportunities, no concerns were expressed to the the trial court. The trial court's comments at the initial sentencing had given notice as to why a consecutive sentence was necessary; neither the purpose nor the spirit of R.C. 2929.14(C)(4)(c) had been violated. The record overwhelmingly supported Halbert's sentence be run consecutive to the sentence about to be completed.

**Extremely Narrow Issue Presented on Appeal**

{¶ 45} The first assignment of error is narrowly tailored: the trial court didn't make an incantation regarding disproportionality. Halbert urges, and the state concedes, reversal should take place because the trial court didn't say "consecutive sentences aren't disproportionate to the seriousness of Halbert's conduct." Inadvertently, the state's

concession can be misleading.

{¶ 46} Our appellate review needs to examine the significance of what was said and determine if the sentence was lawful and supported by the record. Instead Halbert invites us to look for unspoken words. This invitation must be declined. Halbert was noticed as to why his sentence was to run consecutive, and the first time he complained was on appeal.

{¶ 47} The majority implicitly finds that Halbert's "history of criminal conduct" does not include his more recent criminal behavior. However, Halbert's more recent history of killing his cellmate is undeniably part of his criminal legacy regardless of how long ago it happened.

{¶ 48} The Eighth District Court of Appeals said it best:

> The court did not specifically state findings relating to the proportionality of consecutive terms, but the reasons stated in the record make it so obvious that it would be a gesture in futility to require the court to make more specific findings.

*State v. Chaney,* Cuyahoga No. 80496, 2002-Ohio-4020, ¶ 4. The court in *Chaney* concluded that even though there was no word-for-word recitation a consecutive sentence was not disproportionate. Also, the court cogently found that with no objection to the findings, any error was waived as invited error. *Id.* at ¶ 2. Invited error and harmless error do not require a resentencing. *State v. Osie,* 140 Ohio St.3d 131, 2014-Ohio-2966, ¶ 179.

{¶ 49} The parties concede that the trial court found that consecutive sentences were necessary to protect the public from Halbert's future criminal behavior. Logically, this means he poses a danger to the public. If the trial court found (as everyone agrees it did) that Halbert's history of criminal conduct demonstrates that consecutive sentences are *necessary* to protect the public from Halbert's future crime, that finding nullifies a need to recite verbiage regarding *disproportionality*.

{¶ 50} In other words, if the court finds consecutive sentences are necessary to

protect the public from Halbert's future crimes, it is not possible to find that a consecutive sentence was disproportionate to the seriousness of his conduct. The optional, more specific finding in R.C. 2929.14(C)(4)(c) presupposes the general finding contained in the body of 2929.14(C)(4).

{¶ 51} The relevant portions of R.C. 2929.14(C)(4) and subsection (c) state:

(4) * * * the court may require the offender to serve the prison terms consecutively if * * * consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses the public, and if the court also finds one of the following * * *

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 52} The specific, optional finding in subsection (c) is not always made, but when it is made, a disproportionality finding becomes duplicitous and excess baggage because it is a more general finding. Both parties agree subsection (c) was expressly determined by the trial court. The findings involve a need to protect the public from Halbert in the future. There is no need to make the statement twice.[2]

{¶ 53} The majority suggests R.C. 2929.149(C)(4) intends to "focus" or "guide" the trial court's discretion in sentencing. I have no disagreement with that notion. However, despite the rationale offered for the need to address all the findings separately and distinctly, I do disagree that such an incantation is absolute. Satisfying the findings of R.C. 2929.14(C)(4) for a trial court should not be a Rubik's Cube exercise. While incantating each finding separately and repeating the facts might be preferred, sometimes a trial court's words addressing the facts and circumstances satisfy more than one finding as to why

---

2. In this particular case whether the protection consecutive sentences provides is due to the danger that Halbert poses to the public (in the first finding) or whether the protection is necessary because of Halbert's demonstrated history of criminal conduct (in the second finding) is a distinction of no significance.

consecutive sentences are necessary.

{¶ 54} If a consecutive sentence is "necessary," it cannot be "disproportionate." The thought process that affirmatively finds the necessity of the more specific finding simultaneously determines the more general finding. The determination that the offender's demonstrated history of criminal conduct makes consecutive sentences necessary rules out the possibility that making the sentences consecutive is disproportionate. A word-for-word separate and distinct incantation becomes unnecessary and impractical. Requiring more, in the words of *Chaney*, "would be a gesture in futility."[3]

**Notice**

{¶ 55} The trial court specifically mentioned Halbert's time for his current sentence was about to expire, and he noted Halbert's criminal record. These are obvious factors in deciding to make a sentence consecutive. Our majority opinion relies on *Bonnell* for the proposition that the trial court was required to say a consecutive sentence was not disproportionate. However, it was the violent past that led to the finding that Halbert's current violence made it necessary for a consecutive sentence. Halbert, his counsel, and the state were given notice and knew why the trial court found that the sentence had to be served consecutively.

{¶ 56} *Bonnell* established that the purpose of the R.C. 2929.14(C)(4) findings were to afford notice to the offender:

> However, a word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can * * * determine that the record contains evidence to support the findings, consecutive sentences should be upheld.

*Bonnell*, 2014-Ohio-3177, at ¶ 29. Equally persuasive is the concurring in part, dissenting in part, opinion of Justices French and Kennedy which noted that the General Assembly

---

3. The majority's rationale and result appear to conflict with those in *Chaney.*

- 18 -

has given "flexibility" to trial courts and that a court may satisfy R.C. 2929.14(C)(4) by making the findings in the sentencing entry or at the sentencing hearing or at both. *Id.* at ¶ 38. In our current situation the trial court spoke through its journalized entry and referenced the findings given in court. The trial court found that a consecutive sentence was required by Halbert's criminal history and therefore not disproportionate to the seriousness of his recent violent offense.

{¶ 57} There was no assignment of error, or argument, that the entry does not reflect the trial court's in-court findings. With no objection entered at sentencing or at the supplemental sentencing, and with no suggestion the entry needed correction, it would be improper for a reviewing court to ignore, or sua sponte strike, portions of the trial court's entry.

**No Prejudice, No Reversible Error**

{¶ 58} As Justice DeWine recently pointed out, the traditional rule is that for a matter to be reversed the appellant must establish the assigned error actually prejudiced the appellant. This is particularly true if the alleged error is nonconstitutional in nature. *State v. Dangler,* 162 Ohio St.3d 1, 2020-Ohio-2765, ¶ 13-14. Our court has recently reaffirmed it to be axiomatic that an appellant must establish prejudice if alleging reversible error. *State v. Schoenstein*, 12th Dist. Butler No. CA2022-04-044, 2022-Ohio-4446, ¶ 23. Furthermore, any alleged prejudice must be established on the face of the record. *Dangler* at ¶ 24. Halbert, however, neither identified nor argued a prejudice attributed to his claimed reversible error—Halbert claims error without a harm.

{¶ 59} In *Schoenstein*, we began our analysis by acknowledging "it is well-established that a court speaks only through its journal entries and not by oral pronouncement or through decisions. *Id.* at ¶ 17. Although *Schoenstein* involved jail-time credit, the same principles preside herein. We determined that regardless of the reason for

the omission at the pronouncement of sentence, our plain error review did not necessitate a remand as there had been no manifest miscarriage of justice. *Id.* at ¶ 18.

{¶ 60} There is no substantive or constitutional right conferred upon Halbert by virtue of R.C. 2929.14(C)(4), and Halbert argues no exception to the requirement of prejudice to support the need for a reversal. There is no manifest miscarriage of justice in Halbert receiving a consecutive sentence to the sentence about to expire. Rather, Halbert urges us to modify his sentence so he might obtain a windfall. He is hopeful that by committing the cold and brutal killing while incarcerated, he won't need to serve the full sentence for his previous crime. Halbert seeks credit for days off his original sentence because he brutally killed his cellmate—such a request is unfathomable.

**Conclusion**

{¶ 61} I concur with my colleagues in rejecting Halbert's second assignment of error. However, I find no error in the trial court's sentence as pronounced and journalized. If there was an error as claimed, it was invited error, which means it was waived, and there was no prejudice, which means any error was harmless. The sentence was not contrary to law and was supported by the record. Only to this extent does my opinion respectfully differ from that of my colleagues.