[Cite as *State v. Baldwin*, 2024-Ohio-2397.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NOS. CA2023-10-087 |
| | | CA2023-10-088 |
| - vs - | : | |
| | : | O P I N I O N |
| | : | 6/24/2024 |
| JOSHUA DAVID BALDWIN, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 21CR38678 and 23CR40456

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Christopher Bazeley, for appellant.

**HENDRICKSON, J.**

{¶ 1} Appellant, Joshua David Baldwin, appeals from his convictions in the Warren County Court of Common Pleas for grand theft. For the reasons discussed below, we affirm appellant's convictions.

{¶ 2} On November 15, 2021, appellant was indicted in Warren County Court of Common Pleas Case No. 21CR38678 on one count of grand theft in violation of R.C.

2913.02(A)(2), a felony of the fourth degree as the value of the property or services stolen was valued at over $7,500 but less than $150,000. He was subsequently indicted on April 10, 2023, in Warren County Court of Common Pleas Case No. 23CR40456 on another count of grand theft in violation of R.C. 2913.02(A)(2), a felony of the fourth degree. The charge in Case No. 21CR38678 arose from conduct that occurred between April 2, 2020 and June 30, 2021 and involved the victim Nathaniel Johnson. The charge in Case No. 23CR40456 involved conduct that occurred from April 1, 2020 to August 31, 2020, and involved the victim Jill Adler. It was alleged that appellant, who owned Empire Contracting Group ("ECG"), solicited roof repair contracts from homeowners Johnson and Adler, obtained insurance proceeds meant for the projects, and kept the money but never started or completed the projects.

{¶ 3} Appellant pled not guilty to the charges. The state moved to try the two cases together and filed a notice of its intent to introduce evidence pursuant to Evid.R. 404(B) of a third incident involving homeowner, Rebecca Kelso. The state indicated Kelso's testimony about a 2020 incident involving unfinished roof repairs, a forged insurance-proceeds check that had been deposited into ECG's business account, appellant's lack of communication with Kelso after receiving the check, and appellant's failure to start any repairs at Kelso's home was relevant in showing appellant's intent, plan, and the absence of mistake or lack of accident. Appellant objected to Kelso's testimony during pretrial hearings, arguing such evidence was prejudicial and that the state merely wanted to use Kelso's testimony as propensity evidence. The court reserved ruling on whether Kelso's testimony would be permitted until trial.

{¶ 4} Case Nos. 21CR38678 and 23CR40456 were consolidated and a bench trial was held on August 23, 2023. At trial, the state introduced testimony from

- 2 -

homeowners Johnson and Adler, Johnson's wife Jessica, Hamilton Township Police Officer Darcy Vibbard, and Ginger Vining, the Vice President of the Residential Mortgage Department at Park National Bank. The state also introduced testimony from Kelso, over defense counsel's objections, about her dealings with appellant in 2020. Appellant took the stand in his own defense. Various exhibits related to Johson's and Adler's roof repair contracts with ECG and their dealings with appellant were introduced into evidence, including email and text messages the homeowners exchanged with appellant, cashed insurance-proceed checks from the homeowners' respective insurance companies, the Roofing Agreement and Assignment of Benefits Johnson entered into with ECG, multiple roofing repair quotes for Johnson's home, a demand letter sent to ECG from an attorney hired by Johnson asking for Johnson's roof to be completed or for Johnson's money to be refunded by March 1, 2021, and a demand letter sent to ECG from an attorney hired by Adler asking for Adler's money to be returned and for a complete rescission of Adler's roofing contract. From the testimony and exhibits admitted into evidence, the following facts were established.

{¶ 5} In the spring of 2020, appellant and employees of appellant's company were in Johnson's Mainville, Ohio neighborhood and in Adler's Loveland, Ohio neighborhood offering free roof inspections in the aftermath of a hailstorm. Johnson and Adler agreed to roof inspections. Johnson spoke with appellant, the owner of ECG, who advised that Johnson's roof had sustained enough damage to be eligible for an insurance claim. Appellant explained his method for funding expensive roof repairs, stating that he would have Johnson assign his insurance benefits to ECG so that ECG could negotiate with the insurance company. Appellant advised Johnson that he would not have to pay anything out of pocket for the repairs—it would all be covered by insurance proceeds.

{¶ 6} On April 10, 2023, with the understanding that appellant would handle all matters with the insurance company, Johnson signed a contract and an assignment of benefits with ECG. This contract contained a provision entitled "Contingency: Agreement Subject to Insurance Approval," in which the contract provided that the roofing agreement between the parties "is contingent upon, and does not obligate Property Owner or ECG without approval from the Insurance Company (identified above) for payment of all work described * * *." Appellant explained to Johnson, "you're not on the hook to pay me for a roof if insurance doesn't pay." Johnson filed an insurance claim with his insurer, MetLife Insurance Company ("MetLife").

{¶ 7} On April 21, 2023, Johnson signed a "more formal" contract with appellant and ECG. Johnson explained that the contract was identical to the previous version, but "just typed in and cleaner" than the original. The contract listed the cost that appellant had originally quoted for the repairs, which was $39,060. The quote set forth a two-part payment schedule, with the first payment being "Due upon ACV Check" and the final payment being "Due upon RCV - Completion of Job."

{¶ 8} MetLife sent a third-party roof inspector to examine Johnson's roof. The inspector agreed that there was damage that would be covered under Johnson's homeowner's insurance policy. Shortly thereafter MetLife issued a check payable to "Nathaniel Johnson and Jessica Johnson" in the amount of $19,383.88. Johnson and his wife signed the check over to appellant on May 2, 2020. Appellant advised Johnson that the check was "perfect for the first check" as it would allow materials to be ordered while he continued to work with the insurance company to get additional funds for the repair project. Appellant advised Johnson that he believed the amount MetLife had initially approved would not cover the full cost of repairs and he intended to negotiate with the

insurance company for more money. Appellant indicated another inspection of the roof was needed. Appellant "re-ran" the quote for the repairs, providing additional detail for the needed repairs in the quote. The revised quote totaled $52,062, which was $13,000 more than the initial estimate presented to the insurance company.[1] Appellant advised Johnson that once all the inspections were completed, he would go ahead and install the roof so that Johnson was not waiting on appellant and MetLife to agree on a dollar amount for the repairs. On May 6, 2020, appellant texted Johnson "Shingles are ordered. Working on scheduling."

{¶ 9} Months passed without any work being done on Johnson's roof. Johnson continued to communicate with appellant via email, text messages, and phone calls. Initially, appellant was responsive to Johnson's requests for information. However, as time passed, appellant responded less. Appellant would go multiple weeks without responding to Johnson's requests for updates on the roof repair project. Occasionally appellant would send an excuse via text message to explain why he was not responding to Johnson's requests for information—claiming the death of a grandparent, Covid illness, and a hand injury had interfered with his business dealings. Eventually, an employee named "Damian" became Johnson's point of contact at ECG.

{¶ 10} During the time appellant had become unresponsive to Johnson, Johnson received two checks from his insurance company, one for $1,500 and another for $3,500. Rather than signing over the checks to ECG, Johnson and his wife deposited the checks into their own account. Johnson explained, "it had started to feel suspicious, as though we weren't seeing progress. We were continuing to get a runaround and excuses around

---

1. Included in appellant's revised quote was an HVAC unit totaling $4,400. Johnson had already purchased the unit and had it installed in the home. Appellant had advised Johnson that he would include the cost of the HVAC unit as it was possible the insurance company would reimburse the expense.

why the roof wasn't being installed. And we didn't owe any additional payments at that point. [Appellant] wasn't asking for additional payments at that point. He was still just going back and forth with insurance."

{¶ 11} In November 2020, Johnson received an email from MetLife informing him that they made their final payment for the roof repair and were closing the case. A check for $5,704.19 was sent directly to ECG. The check was made payable to "Nathaniel & Jessica Johnson and Park National Bank ISAOA & Empire Contracting Group." Johnson testified that someone forged his signature on the back of the check. Johnson's wife and Ginger Vining, the bank representative, also testified that their signatures had been forged on the back of the check. Vining noted that whoever forged her signature had misspelled her last name by adding an extra "n" (i.e., "Vinning"), and had failed to include her position of Vice-President of Park National Bank.

{¶ 12} Johnson attempted to contact appellant when he received notice that MetLife had closed his claim. Appellant did not respond to Johnson's text messages, phone calls, or voicemails. Johnson was eventually able to get in touch with Damian, who advised that ECG did not agree with MetLife's decision and was looking into taking legal action in order to obtain additional funds for the roof repair. To Johnson's knowledge, ECG did not take any steps after November 2020 to obtain additional funds from MetLife. ECG also did not take any steps to repair his roof. No materials were ever dropped off at Johnson's home for the roof repair work and work was never started on Johnson's home.

{¶ 13} Feeling like he was being strung along and frustrated by the lack of communication and progress, Johnson contacted a lawyer. On February 4, 2021, Johnson's attorney sent a demand letter to appellant and ECG requesting that Johnson's

roof repairs be completed by March 1, 2021, or that the $25,088.07 paid for the roof be returned by March 1, 2021. When the deadline passed without the money being returned or any work being done on the roof, Johnson reached out to law enforcement to make a theft report.

{¶ 14} In March 2021, Officer Vibbard and Captain Short called appellant to discuss Johnson's theft allegations. The phone call was recorded and the recording admitted as evidence. During the call, appellant offered a variety of excuses for why work had not been done on Johnson's home, including delays due to Covid, problems retaining employees, the weather, appellant's hand injury, and a child custody battle in which he was engaged. Appellant acknowledged he and his company had not been communicating with Johnson as frequently as they should have been, but appellant indicated the employee he thought was handling things, Damian, had "dropped the ball." Appellant told the officers that he intended to begin work on Johnson's home once the weather improved and he finished work on a couple of other repair projects. He promised to send documentation to the officers regarding his dealings with Johnson and Johnson's insurance company. However, Officer Vibbard indicated that the police department never received any documentation from appellant and appellant was unresponsive to the police department's subsequent efforts to contact him.

{¶ 15} Shortly after appellant spoke with the police, appellant called Johnson. During that phone call, appellant advised Johnson that he had been out of the office dealing with some family issues and he believed Damian had been handling everything. Now that he was back at work, he realized Damian had "dropped the ball" and he was trying to catch up on everything. Appellant told Johnson that he was either third or fifth in line to get his roof repaired in the spring. At no point in time during this phone call did

appellant indicate that ECG was still continuing to negotiate with the insurance company. Appellant also did not inform Johnson that Johnson personally owed money for the roof repairs. No work was ever started or completed on Johnson's home in the Spring of 2021. As of the date of the bench trial, August 23, 2023, appellant had not delivered any construction materials to Johnson's house, had not started any repair work on Johnson's home, and had not returned any money to Johnson.

{¶ 16} Adler testified to a similar experience with appellant. In early April 2020, appellant knocked on her door following a hailstorm and offered to inspect her roof for damage. After completing the inspection, appellant indicated that his company would negotiate with Adler's insurance company, Allstate Insurance Company ("Allstate"), to obtain funds to repair the roof and the only thing she would be responsible for was paying her $1,000 deductible. Adler testified she signed a contract with appellant, but never received a copy of that contract. The link appellant emailed to Adler, which was supposed to take her to an online copy of the contract, produced an error message. Appellant verbally offered an estimate of between $30,00 and $35,000 to replace Adler's roof.

{¶ 17} Adler reported the roof damage to Allstate and a claim was opened. Allstate issued a check to Adler in May 2020 for $12,405.27. Adler signed the check over to ECG on May 20, 2020. Appellant advised that the money would be used to buy roofing materials and that he would negotiate with Allstate to obtain additional funds for the project. No roofing materials were delivered to Adler's home and no work was started in the spring or summer of 2020. In August 2020, Adler attempted to reach out to appellant for an update and did not get a response. When she tried contacting appellant in September 2020, she learned appellant's phone number had been disconnected.

{¶ 18} In October 2020, Adler called ECG's main business number and was able

to talk to an employee who advised her that ECG was still negotiating with Allstate. The employee further advised that the company did not put roofs on in the winter and she would have to wait until the spring of 2021 for her new roof. Adler was advised to call back in March 2021 if she had not heard anything further from the company.

{¶ 19} In March 2021, Adler followed up with ECG, leaving multiple messages on various business lines at the company. She received an apologetic return call from an ECG employee in May 2021. That was the last contact she had with anyone from ECG, despite later attempts to reach them by phone.

{¶ 20} Amid growing concern that something was wrong, Adler contacted Allstate to check on the status of her claim. Based on that conversation, Adler developed a belief that appellant and ECG had never initiated negotiations with Allstate over the roof repair. Adler hired an attorney, who sent a demand letter to appellant and ECG on October 11, 2021. The letter demanded appellant return the $12,405.27 paid for the roof repairs and the complete rescission of the contract to install a new roof at Adler's home. Neither appellant nor ECG responded to the demand letter. As of the date of the bench trial, appellant had not delivered any construction materials to Adler's house, had not started any work on Adler's roof, and had not returned any money to Adler.

{¶ 21} Kelso testified that in 2020, appellant performed an inspection of her Hamilton, Ohio roof. Kelso entered into an agreement with appellant to have a new roof put onto her home. Appellant claimed to coordinate with Kelso's insurance company to obtain the funds for the roof. The insurance company issued a check to Kelso for the repairs. Kelso did not endorse the check but gave the check to appellant to hold in escrow until work was done on the roof. Appellant never delivered any roofing materials to Kelso's home and never started any work on her roof. He failed to timely respond to

requests for updates or information. When he did respond to Kelso's calls and text messages, he offered various excuses for why he had been out of communication or why work had not been started on her roof. Kelso became frustrated and contacted her insurance company to ask them to void the check that she believed was being held in escrow. At that time, she learned that the check had been cashed. Kelso obtained a copy of the cashed check and learned her signature had been forged. Kelso reported appellant's conduct to the proper authorities and felony charges were filed against appellant in Butler County. The charges were later dismissed after appellant tendered a refund to Kelso.

{¶ 22} Appellant testified that he started his roofing business in 2018 and it went out of business near the end of 2021 or beginning of 2022. Appellant denied any intent to steal from Johnson and Adler. He claimed that when he entered into the roofing contracts with Johnson and Adler and when he accepted money from them, he had every intention of fulfilling his contractual obligations. However, appellant testified that he had trouble finding and retaining employees during Covid and he had a number of personal problems, including a child custody case and recovering from hand surgery, which kept him from completing Johnson's and Adler's roofs. Appellant testified that when he stepped away from his business to deal with personal problems, the employee he left in charge "failed to adequately maintain the business."

{¶ 23} Appellant denied forging any signatures on the checks he received from Johnson's insurance company. Appellant testified that he used the majority of the funds he received from Adler and Johnson to pay his employees and cover ECG's business expenses. He also testified that a portion of the money he received from Johnson was used to purchase roofing materials for Johnson's home. Appellant produced an "Invoice

Reprint" purportedly obtained from Modern Builders Supply, a Cincinnati business, which indicated that roofing materials in the amount of $9,637.03 had been ordered for Johnson's home on May 12, 2020. The roofing supplies were purportedly picked up by ECG and stored in a warehouse. Appellant claimed that when ECG lost its warehouse, the materials were put in a shipping container and moved to a landfill for storage, where he assumed they remained as of the time of trial. As for Adler's roofing contract, appellant believed he had ordered materials for her home, but he could not recall if they were ever paid for or, if received, where the materials were. He claimed he lost access to his business software.

{¶ 24} After considering the foregoing testimony and evidence, the trial court found appellant guilty on both counts of grand theft. In finding appellant guilty, the court indicated it found the state's witnesses to be credible and appellant's "testimony to not be credible. With or without his testimony, I found him not to be credible even in the [recorded] interview with the officer." The court subsequently sentenced appellant to three years of community control and 180 days in jail. Appellant was ordered to pay $25,088.07 in restitution to Johnson and $12,405.27 in restitution to Adler.

{¶ 25} Appellant appealed from his convictions, raising three assignments of error. For ease of discussion, we begin with his third assignment of error and address his first and second assignments of error together.

{¶ 26} Assignment of Error No. 3:

{¶ 27} THE TRIAL COURT ABUSED ITS DISCRETION BY ALLOWING THE STATE TO USE EVID.R. 404(B) EVIDENCE OVER [APPELLANT'S] OBJECTION.

{¶ 28} In his third assignment of error, appellant argues the trial court erred by admitting Kelso's testimony as "other-acts" evidence pursuant to Evid.R. 404(B).

Appellant contends Kelso's testimony was highly prejudicial and was used by the state to show his propensity to commit crimes.

{¶ 29} "Evid.R. 404(B) categorically prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or propensity to commit a crime." *State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, ¶ 36. "Other-acts evidence may, however, be admissible for another non-character-based purpose, such as 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or [lack of] accident.'" *Id.*, quoting Evid.R. 404(B)(2). "The key is that the evidence must prove something other than the defendant's disposition to commit certain acts." *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, ¶ 22. The other-acts evidence "is admissible when the evidence is probative of a separate, nonpropensity-based issue." *Id.*

{¶ 30} The supreme court has articulated a three-part analysis that must be applied when considering the admission of other-acts testimony. *State v. Fannin*, 12th Dist. Warren No. CA2020-03-022, 2021-Ohio-2462, ¶ 17, citing *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 20. Under that three-part analysis, to be admissible, (1) the evidence must be relevant under Evid.R. 401; (2) the evidence must be introduced for a purpose other than proving propensity, like those permitted purposes set forth under Evid.R. 404(B)(2); and (3) the evidence's probative value must not be substantially outweighed by the risk of unfair prejudice under Evid.R. 403(A). *State v. Grate*, 164 Ohio St.3d 9, 2020-Ohio-5584, ¶ 126; *State v. Edwards*, 12th Dist. Warren No. CA2022-11-073, 2023-Ohio-2632, ¶ 48.

{¶ 31} "Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less

probable than it would be without the evidence.'" *State v. Tunstall*, 12th Dist. Butler No. CA2019-06-090, 2020-Ohio-5124, ¶ 34, quoting Evid.R. 401. "In the Evid.R. 404(B) context, the relevance examination asks whether the proffered evidence is relevant to the particular purpose for which it is offered, as well as whether it is relevant to an issue that is actually in dispute." *Smith*, 2020-Ohio-4441 at ¶ 37.

{¶ **32**} "The admissibility of other-acts evidence pursuant to Evid.R. 404(B) [for a nonpropensity-based issue] is a question of law." *Hartman*, 2020-Ohio-4440 at ¶ 22. However, a trial court's determination that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice is an "issue that involves the exercise of judgment" and "should be reviewed for an abuse of discretion." *Id.* at ¶ 30.

{¶ **33**} We find that the trial court properly admitted Kelso's testimony as other-acts evidence admissible for purposes of showing intent and the absence of mistake or lack of accident. "Other-acts evidence is admissible to negate a defendant's claim of mistake or accident with respect to the commission of the alleged crime; such evidence tends '[t]o show, by similar acts or incidents, that the act in question was not performed inadvertently, accidentally, involuntarily, or without guilty knowledge.'" *Hartman* at ¶ 52, quoting McCormick, *Evidence*, Section 190, at 804 (4th Ed.1994). "[A]bsence-of-mistake evidence is often closely linked to intent; to be probative of intent, such evidence must be sufficiently similar to the crime charged." *Smith* at ¶ 45. "The logical theory on which such evidence is premised is that when circumstances arise often enough, it becomes substantially less likely that they have arisen by chance." *Id.* See also *Hartman* at ¶ 56; *State v. Evers*, 139 Wis.2d 424, 437 (1987), quoting 2 Weinstein & Berger, *Weinstein's Evidence*, Section 404[12], at 404-84 to 404-87 (1985) ("'the oftener a like act has been done, the less probable it is that it could have been done innocently'" [emphasis deleted]).

**{¶ 34}** The grand theft offenses appellant was charged with were specific intent crimes, making intent a material issue in the case. *Hartman* at ¶ 55. The state was required to prove that appellant had the purpose of depriving Johnson and Adler of their insurance proceed money by knowingly obtaining and exerting control over the money beyond the scope of the homeowners' consent. Appellant's intent was directly in dispute as he denied having a criminal intent in cashing the homeowners' insurance checks and never performing any roofing services. Appellant offered various excuses as to why he was unable to perform the contracted work, claiming he never had any intent to commit theft against the homeowners but Covid, a custody battle, an injured hand, and the weather all prevented him from performing roofing services for Adler and Johnson. Kelso's testimony was proper 404(B) evidence as it was relevant to rebutting appellant's claim that he had no intention of depriving the victims of their insurance proceeds and that the roofing work was not completed due to accident or mistake.

**{¶ 35}** The circumstances surrounding appellant's dealings with Kelso were significantly similar to those testified to by Johnson and Adler. In 2020, around the same time appellant was contracted to do roofing repairs for Adler and Johnson, appellant entered into a contract to put a new roof on Kelso's home. Appellant claimed to coordinate with Kelso's insurance company and collected insurance proceeds allegedly in pursuit of the roofing job. Like in Johnson's case, Kelso's signature was forged onto the back of the insurance check that was cashed by appellant. Like in both Johnson's and Adler's cases, appellant's communication dropped off after the insurance proceeds were received, no roofing materials were ever delivered, and no work was ever started or completed on Kelso's roof. Appellant did not refund Kelso's money until after criminal charges were brought. Kelso's testimony showed ""by similar acts or incidents, that the act in question

was not performed inadvertently, accidentally, involuntarily, or without guilty knowledge.'" *Hartman* at ¶ 52, quoting McCormick at 804. Kelso's testimony was relevant in demonstrating appellant's mental state and showing his intent to deprive Johnson and Adler of their insurance proceed.

{¶ 36} As Kelso's testimony was relevant under Evid.R. 401 and was introduced for a permitted purpose under Evid.R. 404(B), the only issue that remains is whether the probative value of Kelso's testimony was substantially outweighed by the risk of unfair prejudice under Evid.R. 403(A). Under the circumstances of this case, we find it was not. As this was a bench trial, we presume that the trial court did not rely on Kelso's testimony for an improper purpose in reaching a verdict. *See State v. Shepard*, 1st Dist. Hamilton No. C-190747, 2021-Ohio-964, ¶ 47 (in a bench trial, presumed that the trial court did not rely on evidence of prior robberies as evidence that the defendant acted in conformity with his propensity to commit the robberies for which he was on trial); *State v. Bays*, 87 Ohio St.3d 15, 27 (1999) (noting that unless the record affirmatively discloses otherwise, "the law presumes that in a bench trial the court considers only relevant, material, and competent evidence"). As we have previously recognized, "in a bench trial, 'the trial court is presumed to know the applicable law and apply it accordingly.' * * * [I]n a bench trial, 'a judge is presumed to use evidence for its proper limited purposes and therefore, concern that other acts evidence will be improperly considered by the trier of fact does not exist.'" *State v. Zimmerer*, 12th Dist. Butler No. CA2019-10-176, 2020-Ohio-3921, ¶ 35, quoting *State v. Cornish*, 12th Dist. Bulter No. CA2014-02-054, 2014-Ohio-4279, ¶ 30 and *State v. Pettaway*, 3d Dist. Seneca No. 13-14-18, 2015-Ohio-1597, ¶ 31. Here, there is no evidence in the record indicating the trial court considered the other-acts evidence

for an improper purpose and we presume that it did not do so.[2]

{¶ 37} Accordingly, for the reasons stated above, we find that the trial court did not err in admitting Kelso's testimony as relevant other-acts evidence pursuant to Evid.R. 404(B).  Appellant's third assignment of error is, therefore, overruled.

{¶ 38} Assignment of Error No 1:

{¶ 39} [APPELLANT'S] CONVICTION IS NOT SUPPORTED BY LEGALLY SUFFICIENT EVIDENCE THAT HE HAD THE REQUISITE INTENT TO COMMIT THEFT.

{¶ 40} Assignment of Error No. 2:

{¶ 41} [APPELLANT'S] CONVICTION IS NOT SUPPORTED BY THE WEIGHT OF THE EVIDENCE.

{¶ 42} In his first and second assignments of error appellant argues his convictions for grand theft are not supported by sufficient evidence and are against the manifest weight of the evidence.  Appellant argues that while his business dealings with Adler and Johnson might subject him to civil liability for breach of contract, his conduct does not amount to criminal liability for grand theft as there is no evidence that he acted with the purpose of depriving Adler and Johnson of their insurance proceeds.  He contends that the manifest weight of the evidence demonstrates that his failure to repay the homeowners their insurance proceeds after failing to do the roofing work was the result of his business failing and not because he wanted to control Johnson's and Adler's money beyond the scope of their consent.

---

2. Contrary to appellant's arguments, a statement made by the trial court at sentencing noting that appellant had "done this to many people" is not affirmative evidence that the trial court impermissibly used other-acts evidence when convicting appellant.  The trial court's statements were made nearly a month after the bench trial, when the court was imposing appellant's sentence.

{¶ **43**} Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ **44**} A manifest weight of the evidence challenge, on the other hand, examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66. "While appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, 'these issues are primarily matters for the trier of fact to decide.'" *State v. Barnes*, 12th Dist. Brown No. CA2010-06-009, 2011-Ohio-5226, ¶ 81, quoting *State v. Walker*, 12th

Dist. Butler No. CA2006-04-085, 2007-Ohio-911, ¶ 26. An appellate court, therefore, will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.*, citing *Thompkins*, 78 Ohio St.3d at 387. Furthermore, although the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different, "[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

{¶ **45**} Appellant was convicted on two counts of grand theft in violation of R.C. 2913.02(A)(2), which provides that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [b]eyond the scope of the express or implied consent of the owner or person authorized to give consent." Pursuant to R.C. 2913.01(C), to "deprive" means to do any of the following:

> Withhold property of another permanently, or for a period that appropriates a substantial portion of its value or use, or with purpose to restore it only upon payment of a reward or other consideration;
>
> Dispose of property so as to make it unlikely that the owner will recover it;
>
> Accept, use, or appropriate money, property, or services, with purpose not to give proper consideration in return for the money, property, or services, and without reasonable justification or excuse for not giving proper consideration.

{¶ **46**} A person acts knowingly when, regardless of purpose, "the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). "A person acts purposely when it

- 18 -

is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). With respect to intent, "[t]he law recognizes that [it] can be determined from the surrounding facts and circumstances, and persons are presumed to have intended the natural, reasonable, and probable consequences of their voluntary acts." *State v. Garner*, 74 Ohio St.3d 49, 60 (1995).

**{¶ 47}** After reviewing the record, weighing inferences and examining the credibility of the witnesses, we find that appellant's convictions for grand theft are supported by sufficient evidence and are not against the manifest weight of the evidence. The state presented testimony and documentary evidence establishing all the essential elements of grand theft beyond a reasonable doubt.

**{¶ 48}** With respect to appellant's grand theft conviction relating to his dealings with Adler, the state presented evidence demonstrating that Adler entered into a contract with appellant in April 2020 to have her roof repaired. After opening an insurance claim, receiving $12,405.27 in insurance proceeds, and signing over the money to appellant on May 20, 2020, Adler never saw any materials delivered to her house nor any work completed on her roof. Adler testified that efforts to contact appellant by phone, text, and email for updates on when the repair work would start were left unanswered. Appellant's phone number was disconnected. In October 2020, Adler finally got in touch with an employee of ECG only to be told that the company was still negotiating with her insurer and that she would need to wait until the spring of 2021 for a new roof. When she reached back out to ECG in the spring of 2021, she found the company unresponsive. Growing concerned about the lack of progress, Adler contacted her insurance company and

received information that led her to believe that appellant and ECG had never initiated negotiations with Allstate regarding her roof repair. Despite the fact that Adler had signed over $12,405.27 in insurance proceeds to appellant in May 2020, as of the date of trial (August 23, 2023), no construction materials had ever been delivered to Adler's home, appellant had not started any work on Adler's roof, and appellant had not returned any money to Adler.

{¶ 49} Appellant offered various excuses at trial to explain why no work was completed on Adler's home and why he had failed to maintain communication with Adler, i.e., difficulties staffing during Covid, weather issues, a hand injury, and a custody battle. He believed that he may have ordered materials for Adler's roof but could not recall if the materials were ever paid for or, if received, where the materials were kept. Appellant did not present any invoices or business records relating to the purchasing of materials for Adler's home. Nonetheless, he maintained that he always intended to perform the roofing work for Adler.

{¶ 50} "In a bench trial, the trial court acts as the factfinder and determines both the credibility of the witnesses and the weight of the evidence." *State v. Lowry*, 12th Dist. Warren Nos. CA2019-07-070 and CA2019-07-071, 2020-Ohio-1554, ¶ 19. "[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony." *State v. Lunsford*, 12th Dist. Brown No. CA2010-10-021, 2011-Ohio-6529, ¶ 17. Here, the court ultimately found the state's witnesses testimony more credible than appellant's testimony. As the trier of fact was in the best position to judge the credibility of the witnesses, we will not disturb the trial court's finding in regard to which version of events was credible and which was not. *State v. Martino*, 12th Dist. Butler No. CA2017-09-139, 2018-Ohio-2882,

¶ 13. The trial court was entitled to find that appellant intended to deprive Adler of the $12,405.27 paid for roofing services. The evidence demonstrated appellant exerted control over the money beyond the scope of Adler's consent when he refused to perform the contracted for services and failed to return the money. Appellant's conviction for grand theft as it related to his dealings with Adler was, therefore, not against the manifest weight of the evidence and was supported by sufficient evidence. *See, e.g.*, *State v. Belt*, 3d Dist. Union No. 14-03-36, 2004-Ohio-1511 (upholding a defendant's theft by deception conviction where the defendant, hired to refurbish a barn, did not provide any services to the owner or deliver any material to the owner's residence, despite being paid for said services).

{¶ 51} With respect to appellant's grand theft conviction relating to his dealings with Johnson, we likewise find that the state presented evidence demonstrating that appellant had the intent to deprive Johnson of the $25,088.07 paid for roofing services that he did not intend to perform. On May 2, 2020, Johnson gave appellant $19,383.88 in insurance proceeds for the roof repairs. Appellant claimed to have ordered nearly $9,700 worth of supplies for Johnson's roof repairs by mid-May 2020 and to have received the roofing materials shortly thereafter. However, no roofing supplies were ever delivered to Johnson's home and no roofing work ever began on Johnson's home. Instead, if appellant's testimony were to be believed, the roofing materials were kept in storage—first at a warehouse and then in a shipping container at a landfill. As of the date of trial, appellant believed the roofing materials were still in storage at the landfill.

{¶ 52} Johnson testified that after May 2020, appellant started to become unresponsive in his communication with Johnson. Johnson sought updates on when roof repairs would begin via phone call, text, and email. Appellant would ignore the texts,

sometimes for weeks, before responding with an excuse to explain his unresponsiveness and the lack of progress that had been made. Appellant claimed a death of a grandparent, issues related to the Covid-19 pandemic, and a hand injury had interfered with his business dealings. In November 2020, Johnson received an update from his insurance company, advising him that final payment for the roof repairs had been made and a check for $5,704.19 had been sent directly to ECG. This check, made payable to ECG, Johnson, Johnson's wife, and Park National Bank, was cashed after Johnson's, his wife's, and Park National Bank's signatures were forged. In February 2021, Johnson sent a demand letter to appellant and ECG requesting that the roof repairs on his home be completed by March 1, 2021, or the $25,088.07 paid for the repairs be returned. No work was ever started on Johnson's roof and the funds were never returned. When appellant spoke with the police after Johnson reported appellant's conduct, appellant indicated his intent to complete the roofing work and his intent to send the officers paperwork and communications relating to Johnson's roof repair project. However, appellant never provided the information to the police, never responded to the police officers' subsequent efforts to contact him, and never performed any roof repair work on Johnson's home.

{¶ 53} Appellant's actions in accepting the insurance proceeds, failing to communicate with the homeowner, failing to deliver any roofing materials, and failing to perform any roofing services on Johnson's home demonstrates appellant's intent to deprive Johnson of the $25,088.07 paid for roofing services. Appellant exerted control over the money beyond the scope of Johnson's consent when he refused to perform the contracted for services and failed to return the money. The trial court was entitled to find that appellant did not have reasonable justification or excuse for never performing the roofing work or returning the funds. Accordingly, appellant's conviction for grand theft as

it related to his dealings with Johnson was also not against the manifest weight of the evidence and was supported by sufficient evidence. *See, e.g., State v. Dalton*, 11th Dist. Portage No. 2008-P-0097, 2009-Ohio-3149 (upholding a defendant's theft conviction and concluding it was reasonable to infer the defendant intended to deprive the homeowner of her money beyond the scope of her consent where the defendant accepted payment in full for home-repair work, performed minimally on the contract, and avoided contact with the homeowner).

{¶ 54} Having found that both of appellant's convictions for grand theft are supported by sufficient evidence and are not against the manifest weight of the evidence, we hereby overrule his first and second assignments of error.

{¶ 55} Judgment affirmed.

S. POWELL, P.J., and PIPER, J., concur.